**UNITED STATES of AMERICA,**
Plaintiff–Appellee,

v.

**Antonio Medina PUERTA,**
Defendant–Appellant.

No. 91–50652.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted July 9, 1992.

Decided Dec. 22, 1992.

Joseph T. Vodnoy and Joseph F. Walsh, Los Angeles, CA, for defendant-appellant.

Russell Petti, Asst. U.S. Atty., Los Angeles, CA, for plaintiff-appellee.

Before: FLETCHER, O'SCANNLAIN, and KLEINFELD, Circuit Judges.

FLETCHER, Circuit Judge:

Antonio Medina Puerta appeals his conviction for violation of 18 U.S.C. § 1425 (unlawful procurement of citizenship). We reverse.

## I. Facts

Puerta was born in Almeria, Spain on January 20, 1956. He entered the United States on a student visa in 1981 and was admitted as a permanent resident in 1984. On February 26, 1990, he filed an applica-

tion for naturalization. Question 5 asked him to list "[a]ny other names you have used (including maiden)." Puerta left this space blank. Questions 27 and 28 asked him to list any absences from the United States (for less or more than six months, respectively) since the time he entered for permanent residence. He wrote "None" in response to both questions.

On June 4, 1990, Puerta was interviewed by Immigration Examiner Robert Johnson. At trial, Johnson testified that he had no recollection of Puerta's interview. However, Johnson explained that his standard practice was to require every applicant to swear that the statements made on the application were true, and to review orally with the applicant the answer to each question. Johnson further explained that the slash marks on Puerta's application were his, undoubtedly made during his interview with Puerta. The slashes, Johnson said, indicated that Puerta orally answered questions 5, 27, and 28 the same way as he had done in writing: he had not used any other names and had never left the United States after entry. Puerta was naturalized shortly after his interview.

On February 7, 1991, several months after his naturalization, Puerta attempted a two-part transaction at the La Canada branch of the Bank of America. First, he presented for deposit into his account a $900 check payable to Anthony Port, drawn on a Security Pacific Bank account in the name Anthony Simon. Second, he tried to cash a $750 check drawn on his Bank of America account. The bank teller's computer flashed a warning that read "Fraudulent account. Call local police." A phone call established that the Security Pacific account had been closed for at least six months. Also, Bank of America's records showed that Puerta's account with it was placed "on hold," in part because the account was new, and in part because one of the checks used to open the account (a $35,000 check written by Puerta on a Home Federal account) had been returned for insufficient funds. Branch manager Brenda Santos called the police and explained the situation to them when they arrived.

Sergeant Roger Kelley of the Los Angeles County Sheriff's Department questioned Puerta in the bank's lounge. Puerta identified himself as Anthony Port, and presented a California driver's license in that name. Kelley noticed that Puerta's wallet appeared to contain other driver's licenses. Puerta consented to showing them. They were a Massachusetts driver's license in the name Anthony Port, a second Massachusetts driver's license in the name Anthony Simon, and an international driver's license issued in Spain in the name Anthony Port Martin. The birth dates on the various licenses did not match. Puerta had no plausible explanation for the multiple licenses and behaved nervously while being questioned. Kelley placed Puerta under arrest for attempting to defraud the bank in violation of California law. A search incident to the arrest revealed another Massachusetts driver's license in the name Medina Puerta, and a Spanish passport in the name Antonio Simon Palmer. The passport contained a United States non-immigrant visa obtained in Madrid, Spain on August 16, 1989, which was used to enter the United States on September 5, 1989. All pieces of identification were dated prior to February 26, 1990, the date Puerta filed his application for naturalization.

On March 5, 1991, a grand jury indicted Puerta on one count each of violating 18 U.S.C. § 1425 (unlawful procurement of citizenship) and 18 U.S.C. § 1546(a) (use of a false non-immigrant visa). A two-day bench trial began on May 9, 1991. By agreement of the parties, the district court heard testimony with regard to Puerta's motion to suppress evidence simultaneously with the trial testimony. The district court denied the motion to suppress in an oral ruling which concluded that there was probable cause to arrest Puerta. The court then convicted Puerta on Count One, finding that he had testified falsely when questioned by the immigration examiner. The district court acquitted Puerta of Count Two.

On August 12, 1991, Puerta was sentenced under the Guidelines to two months in prison (to be followed by two years of

supervised release), and was fined $2,000. Puerta's certificate of naturalization was voided pursuant to 8 U.S.C. § 1451(f), which requires this step upon a conviction under 18 U.S.C. § 1425. Puerta now appeals.

## II. Discussion

### A. *Motion to Suppress*

■ Puerta moved to suppress the various forms of identification found on his person at the Bank of America. The items were discovered and seized in the course of a warrantless search. However, a warrant is not necessary where the defendant consents to the search, *Florida v. Royer*, 460 U.S. 491, 497, 103 S.Ct. 1319, 1323, 75 L.Ed.2d 229 (1983), or where the search is conducted incident to a lawful arrest, *New York v. Belton*, 453 U.S. 454, 457, 101 S.Ct. 2860, 2862, 69 L.Ed.2d 768 (1981). The district court's findings of fact are reviewed for clear error, but the legal conclusion that the underlying facts provide a basis for probable cause to arrest is reviewed de novo. *United States v. Linn*, 880 F.2d 209, 214 (9th Cir.1989).

■ The district court found the testimony of bank manager Santos and Sergeant Kelley credible. It also found, based on Kelley's testimony, that before Puerta was arrested, he consented to show Kelley the California driver's license, the first two Massachusetts licenses, and the international driver's license. Whether consent is given voluntarily is a question of fact. *Schneckloth v. Bustamonte*, 412 U.S. 218, 227, 93 S.Ct. 2041, 2047–48, 36 L.Ed.2d 854 (1973). The district court's finding of voluntary consent was not clearly erroneous.

■ The third Massachusetts driver's license and the Spanish passport were discovered in the search incident to Puerta's arrest. They may be admitted only if the arrest was supported by probable cause.

"The test for probable cause is whether facts and circumstances within the officers' knowledge are sufficient to warrant a prudent person, or one of reasonable caution, to believe, in the circumstances shown, that the suspect has committed, is committing or is about to commit an offense." *United States v. Thomas*, 835 F.2d 219, 222 (9th Cir.1987) (internal punctuation and citations omitted), *cert. denied*, 486 U.S. 1010, 108 S.Ct. 1741, 100 L.Ed.2d 204 (1988).

In light of the information provided by Santos, Puerta's many conflicting forms of identification, and Puerta's lack of any plausible explanation, Kelley could reasonably believe that Puerta was attempting to defraud the bank. Puerta objects that Kelley did not have any basis to believe that Puerta had intent to defraud, one of the elements of Cal.Penal Code § 476a. We disagree. It is reasonable to infer intent to defraud when a person attempts to withdraw cash from a newly opened bank account against two large bad checks written by him under different names on other accounts. The district court properly denied the motion to suppress.[1]

### B. *Sufficiency of the Evidence*

We must affirm the conviction if, "viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Calabrese*, 825 F.2d 1342, 1348 (9th Cir.1987).

■ Puerta was convicted of violating 18 U.S.C. § 1425(a), which provides: "Whoever knowingly procures or attempts to procure, contrary to law, the naturalization of any person ... [s]hall be fined not more than $5,000 or imprisoned not more than five years, or both." The statute does not define the phrase "contrary to law." Presumably the "law" referred to is the

---

1. Puerta argues for the first time in his reply brief that the evidence must be suppressed in federal court because it was seized by state officers investigating a state offense. New arguments may not be introduced in a reply brief. In any event, this argument is meritless. The case he cites, *Elkins v. United States*, 364 U.S. 206, 223, 80 S.Ct. 1437, 1447, 4 L.Ed.2d 1669 (1960), holds simply that the fruits of state searches that violate the Fourth Amendment must be suppressed. It did not announce a federal ban on evidence seized lawfully by state officers.

law governing naturalization, 8 U.S.C., ch. 12, subchapter III. Puerta was prosecuted for false statements he made on his naturalization application and to an immigration examiner.[2] No reported cases discuss whether § 1425(a) requires that false statements made to procure naturalization be material in order to be "contrary to law." We note, however, that 8 U.S.C. § 1451(a) permits denaturalization if citizenship was "procured by concealment of a *material* fact or by willful misrepresentation" (emphasis added). Further, the government agrees with Puerta that § 1425(a) implies a materiality requirement similar to the one used in the denaturalization context. This position finds support in *Kungys v. United States*, 485 U.S. 759, 108 S.Ct. 1537, 99 L.Ed.2d 839 (1988), the leading denaturalization case: "While we have before us here a statute revoking citizenship rather than imposing criminal fine or imprisonment, neither the evident objective sought to be achieved by the materiality requirement, nor the gravity of the consequences that follow from its being met, is so different as to justify adoption of a different standard." *Id.* at 770, 108 S.Ct. at 1546. We therefore look to the standards governing materiality in the denaturalization context as a guide to determining what is "contrary to law" under 18 U.S.C. § 1425.

In order to be naturalized, an applicant must demonstrate that he or she satisfies the numerous statutory criteria of the Immigration and Naturalization Act.[3] The relevant criteria in this case require that the applicant has continuously resided in the United States for five years after being lawfully admitted for permanent residence, and that the applicant "has been and still is a person of good moral character" during

that time. 8 U.S.C. § 1427(a). Immigration Officer Linda Nowlon testified at trial that neither the use of aliases nor brief absences from the United States are per se barriers to naturalization. Both, however, would be cause for further investigation. The Immigration and Naturalization Service ("INS") would check records under the aliases to ensure that the applicant had no criminal record that would have prevented the applicant's lawful admission to permanent residency,[4] and it would compute the applicant's total foreign travel time to see if it exceeded the maximums allowed under 8 U.S.C. § 1427(a) and (b). If such an investigation unearthed no disqualifying facts, the applicant could be naturalized. Because of the answers Puerta gave to the INS, no such investigation was undertaken.

The district court found that Puerta had made two false statements to the INS: that he had never used any other names, and that he had never left the United States for any period of time since his entry. However, as the government acknowledged at oral argument, the record does not establish that Puerta was statutorily ineligible for naturalization. There was no evidence that Puerta had a criminal record under any of his aliases or that he had been absent from the United States for an excessive period of time. What remains, then, is a question of law: Can telling lies with nothing more support a criminal conviction under § 1425?

The district court's judgment of guilt relied primarily on its determination that Puerta lacked "good moral character." An applicant for naturalization who "has given false testimony for the purpose of obtaining [immigration] benefits" cannot be

**2.** We reject Puerta's claim that there is insufficient evidence that he gave any false oral testimony. Even though Immigration Examiner Johnson did not recall Puerta's interview, a reasonable trier of fact could conclude from Johnson's testimony and from the marks on Puerta's application form that Johnson followed standard procedures in Puerta's case, and therefore that Puerta made the statements attributed to him.

**3.** For example, naturalization is denied to applicants who have deserted the armed forces (8

U.S.C. § 1425) or do not speak English or understand American institutions (8 U.S.C. § 1423).

**4.** Permanent resident status may only be obtained by aliens who are eligible for immigrant visas. 8 U.S.C. § 1255(a). Visas are not issued to "excludable" aliens, i.e., those who have committed certain crimes, pose health or security risks, or are otherwise barred by statute. 8 U.S.C. § 1182(a).

found to possess good moral character. 8 U.S.C. § 1101(f)(6). On its face, subsection 1101(f)(6) contains no materiality requirement. *Kungys*, 485 U.S. at 779–82, 108 S.Ct. at 1550–52. The district court reasoned:

> Based upon the opinion of the Supreme Court in the case of *Kungys v[.] United States*, it is the [c]ourt's opinion that the false statements must be proven to be material unless they qualify under Section 1101[ (f) ], as statements which preclude a finding of good moral character. As long as the defendant made false oral statements to an examiner, he can't establish good character, even if disclosing the truth would not have affected the decision whether to grant him citizenship.

Reporter's Transcript, 5/10/1991 at 4–5 (citation omitted). Applying its reading of *Kungys* to § 1425, the district court concluded that when Puerta gave material or immaterial false testimony to the INS in order to gain citizenship, he barred himself from demonstrating the requisite good moral character, and that procurement of naturalization in the absence of good moral character is "contrary to law."

Whatever role the "good moral character" requirement may play in a civil denaturalization proceeding, simply being a person who cannot establish it in court is not a crime. Criminal punishments may be imposed only for a defendant's acts, not a defendant's status. The government could no more impose criminal sanctions for being a person lacking good moral character than it could for being a narcotics addict, *Robinson v. California*, 370 U.S. 660, 666, 82 S.Ct. 1417, 1420, 8 L.Ed.2d 758 (1962), an alcoholic, *Powell v. Texas*, 392 U.S. 514, 532, 88 S.Ct. 2145, 2154, 20 L.Ed.2d 1254 (1968), or a homosexual, *Bowers v. Hardwick*, 478 U.S. 186, 202 n. 2, 106 S.Ct. 2841, 2850 n. 2, 92 L.Ed.2d 140 (1986) (Blackmun, J., dissenting); *Gay Alliance of Students v. Matthews*, 544 F.2d 162, 166 (4th Cir. 1976). "[C]riminal penalties may be inflicted only if the accused has committed some

act, has engaged in some behavior, which society has an interest in preventing...." *Powell*, 392 U.S. at 533, 88 S.Ct. at 2154. *Cf.* Fed.R.Evid. 404 (evidence of a person's character is not admissible to prove that the person committed a particular act); *United States v. Brown*, 880 F.2d 1012, 1014 (9th Cir.1989) (same). Congress has addressed the impact of immaterial false testimony only in the "good moral character" provision in 8 U.S.C. § 1101(f)(6). We conclude that it has not made immaterial false testimony in naturalization proceedings a crime.

Material false statements are another matter, because the denaturalization statute makes them culpable regardless of the applicant's moral character. 8 U.S.C. § 1451(a). After *Kungys*, however, it is no simple task to divine the meaning of "material" under the denaturalization statute. The eight Justices who decided *Kungys* (Justice Kennedy did not participate) wrote five separate opinions and offered three distinct tests for determining when a statement is material.[5]

Puerta claims that his false statements were not material because they were not shown to conceal actual ineligibility for naturalization. For support of this position, he cites Justice Stevens' concurrence in *Kungys* (joined by Justices Marshall and Blackmun). *Kungys*, 485 U.S. at 785–95, 108 S.Ct. at 1552–59. Justice Stevens argued for the continued vitality of the test first enunciated in *Chaunt v. United States*, 364 U.S. 350, 355, 81 S.Ct. 147, 150, 5 L.Ed.2d 120 (1960), which suggested that concealments or misrepresentations would not be material if (1) the truth would not have warranted denial of citizenship or (2) the truth would not have been useful in an investigation possibly leading to the discovery of other facts warranting denial of citizenship.

Unfortunately for Puerta, Justice Stevens' view attracted only three votes. Justice Scalia's opinion for the Court in *Kun-*

---

**5.** Six Justices agreed that under their preferred tests, petitioner Kungys' statements regarding his date and place of birth were not material and did not provide a basis for denaturalization. Justices White and O'Connor dissented.

*gys* expressly rejected a "but for" test that would require the Government to "establish that naturalization would not have been granted if the misrepresentations or concealments had not occurred." *Kungys*, 485 U.S. at 776, 108 S.Ct. at 1549.[6] Five members of the Court emphasized that "[i]t has never been the test of materiality that the misrepresentation or concealment would *more likely than not* have produced an erroneous decision, or even that it would *more likely than not* have triggered an investigation." *Id.* at 771, 108 S.Ct. at 1547 (original emphasis). Chief Justice Rehnquist, concurring Justice Brennan, and dissenting Justices White and O'Connor joined this portion (Part II–A) of Justice Scalia's opinion. *Id.* at 783, 801, 803, 108 S.Ct. at 1552, 1562, 1563. A five-member majority of the Court has therefore agreed that *Chaunt* did not establish a minimum burden that the government must meet in order to establish materiality.

While those five agreed on what materiality is *not*, they did not speak with one voice as to what it *is*. Justice Scalia's opinion began from the premise that elsewhere in the criminal law, "materiality" meant "whether the misrepresentation or concealment was predictably capable of affecting, *i.e.*, had a natural tendency to affect, the official decision." *Id.* at 771, 108 S.Ct. at 1547. In his view, the test for materiality in a denaturalization case would be "whether the misrepresentation or concealment had a natural tendency to produce the conclusion that the applicant was qualified" for citizenship. *Id.* at 771–72, 108 S.Ct. at 1547. Under Justice Scalia's test, Puerta's misrepresentations were without a doubt material, because they had a natural tendency to affect the decision by creating the appearance that no further investigation of Puerta's background was necessary. The district court, when pressed by the government to find a basis for its holding other than failure to establish good moral character, applied the Scalia test:

[MR. PETTI, for the government]: Does the [c]ourt make any determination as to whether in the alternative the statements were in fact material because they tended to influence a positive decision in favor of his naturalization?

. . . . .

THE COURT: In my view they were material; that is, the misrepresentations or concealments had a natural tendency to produce a conclusion that the applicant was qualified.

That is the test.

Reporter's Transcript, 5/10/1991 at 10–11.

Justice Scalia's test, as noted *supra*, was joined in full only by Chief Justice Rehnquist and Justices White and O'Connor (both of whom adopted the test but disagreed with the result of its application to the facts of the case). Justice Brennan, in a concurring opinion, restricted the application of Justice Scalia's test:

The Court holds that a misrepresentation is material if it has "a natural tendency to produce the conclusion that the applicant was qualified" for citizenship. A misrepresentation or concealment can be said to have such a tendency, the Court explains, if honest representations "would predictably have disclosed other facts relevant to [the applicant's] qualifications." Proof by clear, unequivocal, and convincing evidence that the misrepresentation had this tendency raises a presumption of ineligibility, which the naturalized citizen is then called upon to rebut.

I agree with this construction of the statute. I wish to emphasize, however, that in my view *a presumption of ineligibility does not arise unless the Government produces evidence sufficient to raise a fair inference that a statutory disqualifying fact actually existed.* . . . Evidence that simply raises the possibility that a disqualifying fact might have existed does not entitle the Government to the benefit of a presumption that the citizen was ineligibile [sic]. . . . I therefore would not permit invocation of

---

6. Chief Justice Rehnquist and Justice Brennan joined in this part (Part II–B) of Justice Scalia's opinion of the Court.

the presumption of disqualification in circumstances where it would not otherwise be fair to infer that the citizen was actually ineligible.

Because nothing in the Court's opinion is inconsistent with this standard, I join it.

*Id.* at 783–84, 108 S.Ct. at 1552 (Brennan, J., concurring) (emphasis added; citations omitted). This test appears to differ from Justice Stevens' "but for" test only in degree: Justice Stevens would denaturalize where false statements are coupled with a showing of actual ineligibility, whereas, by contrast, Justice Brennan would denaturalize where false statements are coupled with evidence giving rise to a "fair inference" of ineligibility. In any event, four members of the Court (Justices Brennan, Stevens, Marshall, and Blackmun) would require that the government prove more than Justice Scalia's bloc (Justice Scalia, Chief Justice Rehnquist, and Justices White and O'Connor) would require.

Justice Brennan's view of materiality controls here. As a matter of construction, "[w]hen a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, 'the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds.'" *Marks v. United States,* 430 U.S. 188, 193, 97 S.Ct. 990, 993, 51 L.Ed.2d 260 (1977) (quoting *Gregg v. Georgia,* 428 U.S. 153, 169 n. 15, 96 S.Ct. 2909, 2923 n. 15, 49 L.Ed.2d 859 (1976) (opinion of Stewart, Powell, and Stevens, JJ.)). Justice Brennan apparently viewed his opinion as a narrowing construction of Justice Scalia's opinion: "Because nothing in the Court's opinion is inconsistent with this standard, I join it." *Kungys,* 485 U.S. at 784, 108 S.Ct. at 1552; *see also id.* at 793, 108 S.Ct. at 1558 (Stevens, J., concurring in judgment) ("Though joining the Court's opinion, Justice Brennan would require more."). Thus, as the fifth vote needed to establish the "controlling" materiality standard, Justice Brennan's construction may be taken as the holding (he requires *less* than the three in the Stevens group that would require in addition to false statements a showing of

actual ineligibility, but he requires *more* than the Scalia group that would require only false statements which discourage further inquiry).

Whether a given quantum of evidence supports a fair inference of ineligibility (the *Kungys* test for the materiality of false statements, as announced by Justice Brennan) will vary with the facts of each case. *This* record contains no evidence from which any finder of fact could fairly infer that Puerta was actually ineligible for naturalization. All we know is that Puerta (1) denied the use of other names, yet carried many conflicting forms of identification, and (2) claimed not to have left the United States, yet carried a Spanish passport indicating at least one trip abroad. These discrepancies are certainly suspicious. But the government has offered no evidence linking them even tangentially to any statutory ground for disqualification. There is no basis for a trier of fact to conclude that Puerta was hiding a criminal record under one of his aliases. The suspicious banking transaction for which he was arrested is useless as proof of ineligibility, because it occurred after his naturalization and had not formed the basis of a state-court criminal conviction at the time of Puerta's federal trial. Nor does Puerta's single proven absence from the United States fairly support an inference of ineligibility, given that the statute allows up to two and one-half years' absence during the five-year residency period, provided that no single absence exceeds six months (or more under certain circumstances). 8 U.S.C. § 1427(a), (b). Under Justice Brennan's approach, "the defendant at least has the benefit of knowing specifically what disqualifying fact must be rebutted." *Kungys,* 485 U.S. at 793, 108 S.Ct. at 1558 (Stevens, J., concurring in judgment). Puerta did not have that opportunity because the existence of any disqualifying fact can only be postulated by indulging in the purest speculation. Under *Kungys,* Puerta's false statements were not material, and therefore may not form the basis of a criminal conviction under § 1425.

We recognize the potential anomaly in Justice Brennan's test in *Kungys*, which contemplates a higher standard of materiality in immigration law than does the criminal law generally. For example, in a prosecution under 18 U.S.C. § 1001 (criminalizing falsification or concealment of material facts in government applications), a false statement is material "if it has the propensity to influence agency action; actual influence on agency action is not an element of the crime." *United States v. Facchini*, 874 F.2d 638, 643 (9th Cir.1989) (en banc) (quoting *United States v. Vaughn*, 797 F.2d 1485, 1490 (9th Cir.1986)); *see also Kungys*, 485 U.S. at 769–70, 108 S.Ct. at 1545–46. Whatever attractions a unitary approach to materiality may have, its application to the immigration laws has failed to win an endorsement from a majority of the Supreme Court.

Our decision does not strip the government of all weapons to punish dishonest applications for citizenship. It may pursue civil denaturalization proceedings in proper cases. It may seek an indictment for false statements to the federal government under 18 U.S.C. § 1001, which carries its own well-developed case law of materiality. It may also proceed under § 1425, so long as it has evidence sufficient to justify a fair inference of actual ineligibility for citizenship. *See United States v. Perlmuter*, 693 F.2d 1290, 1292 (9th Cir.1982) (defendant's conviction under § 1425 for falsely claiming to have no criminal record reversed for lack of authenticated proof of prior criminal record).

### III. Conclusion

Because we reverse for insufficient evidence, we have no need to address Puerta's other claims of error.

REVERSED and REMANDED with instructions to enter a judgment of acquittal.