**Bogar Allax MONTER, Petitioner,**

v.

**Alberto GONZALES,* Attorney General of the United States, Respondent.**

**Docket No. 03–4070.**

United States Court of Appeals, Second Circuit.

Argued:  May 17, 2005.

Final submission:  July 27, 2005.

Decided:  Nov. 14, 2005.

* Pursuant to Federal Rule of Appellate Procedure 43(c)(2), we have substituted Attorney General Alberto Gonzales for former Attorney General John Ashcroft as the respondent in this case.

Eva S. Rubinson, Avirom & Associates LLP (Jonathan E. Avirom, of counsel), New York, NY, for Petitioner.

Audrey B. Hemesath, Special Assistant United States Attorney for the Eastern District of California (McGregor W. Scott, United States Attorney, of counsel), Sacramento, CA, for Respondent.

Before: MINER and SACK, Circuit Judges, and SPATT, District Judge.**

SACK, Circuit Judge.

The petitioner, Bogar Allax Monter, a citizen of Mexico, entered the United States in 1988, married a United States citizen in 1993, and thereafter began the process of attempting to become a United States citizen. In the course of that effort, several years after he was married and after he had been granted conditional permanent residency status, he submitted a form I–751 Petition to Remove the Conditions of Residence ("I–751 Petition") to the Immigration and Naturalization Service ("INS"),[1] which was approved without an interview. The INS later discovered, however, that Monter had made a misrepresentation in his I–751 form. The central questions with respect to this petition are whether the misrepresentation was "material" and whether Monter was therefore removable[2] under the immigration laws. The Immigration Judge ("IJ") and the Board of Immigration Appeals ("BIA") answered in the affirmative as to both.

In his petition to this Court, Monter argues that the BIA was wrong to conclude that "by giving false information concerning his separation from his wife, [Monter] procured a benefit under the Immigration and Nationality Act by willfully misrepresenting a material fact." *In re Monter*, A73–496–973 (B.I.A. Dec. 9, 2002) (per curiam). He further argues that the BIA erred in holding that Monter's willful misrepresentation rendered him removable without deciding whether Monter's truthful response would necessarily have prompted the INS to deny his original I–751 Petition. Monter also asserts that the IJ abused his discretion by denying Monter's motions for a change of venue and for a continuance, and by not informing Mon-

---

** The Honorable Arthur D. Spatt, of the United States District Court for the Eastern District of New York, sitting by designation.

1. On March 1, 2003, the Immigration and Naturalization Service was reconstituted as the Bureau of Immigration and Customs Enforcement ["ICE"] and the Bureau of U.S. Citizenship and Immigration Services, both within the Department of Homeland Security. Because the rulings at issue in this case were made when the agency was still the INS, we refer to it as the INS in this opinion.

*Brown v. Ashcroft*, 360 F.3d 346, 348 n. 1 (2d Cir.2004).

2. Following the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub.L. No. 104–208, Div. C, 110 Stat. 3009–546, we generally use the terms "remove" and "removable" in this opinion rather than the terms "deport" and "deportable." *See Evangelista v. Ashcroft*, 359 F.3d 145, 147 n. 1 (2d Cir.2004), *cert. denied,* —— U.S. ——, 125 S.Ct. 1293, 161 L.Ed.2d 105 (2005).

ter of other forms of relief available to him.

We think that the BIA correctly determined that Monter's misrepresentation was material. We further conclude, however, that under the prevailing law governing these proceedings, the BIA's determination merely established a presumption of removability, one that Monter must be afforded the opportunity to rebut. Because Monter was not given this opportunity and because he may have been prejudiced by the IJ's denial of his motion for a change of venue, we grant the petition insofar as we vacate the order of the BIA and remand with instructions for it, in turn, to vacate the IJ's order and remand with instructions to the Immigration Court to grant Monter's request for a transfer of this matter to New York City for his hearing.

## BACKGROUND

According to Monter, he entered the United States in 1988. In June 1992, he met Jennifer Warner, a United States citizen. In February 1993, they began to cohabit in Pelham, New York.

On December 10, 1993, Monter and Warner were married in a civil ceremony in nearby New Rochelle, New York. A religious ceremony followed in October of the following year after Jennifer Warner, now Jennifer Monter, had converted to Roman Catholicism. Nearly two years later, on October 2, 1995, Monter obtained Conditional Permanent Residence based on his status as the spouse of a United States citizen.

In January 1997, more than a year-and-a-half after his change of status, Monter and his wife separated and thereafter resided apart from one another. Monter testified before the IJ that he and his wife

nonetheless continued to see each other once or twice a week. He said that they had been hoping that they would reconcile and that they had not at that time discussed the possibility of, let alone obtained, a divorce.

Six months after Monter and his wife separated, he filed his I–751 Petition to "Remove the Conditions of Residence," which was jointly signed by his wife.[3] The petition form asks for the address of the petitioner's residence and also for the address of "the spouse or parent through whom [he] gained [his] conditional residence." *See* I–751, "Petition to Remove Conditions on Residence," U.S. Dep't of Homeland Security, Bureau of Citizenship & Immigration Servs., *available at* http://uscis.go v/graphics/form sfee/ forms/file s/I–751.pdf (last visited Nov. 11, 2005). Monter falsely listed the same address for both Jennifer and himself. It was, in fact, the address at which his wife was living, but not where he then resided.

Monter's I–751 Petition was approved without an interview on September 5, 1997. He thereby became a Permanent Resident of the United States.

Also in 1997, Monter established a relationship with a Canadian woman with whom, in November of that year, he began to cohabit in Canada. In March 1998, while attempting to enter the United States from Canada, Monter was stopped and questioned by United States immigration officials in Buffalo, New York. He executed a sworn statement in Buffalo, describing his separation and admitting that he realized at the time he submitted his I–751 Petition that he was committing fraud. The statement included this dialog:

Q. At the time you adjusted your status ... were you separated from your wife?

3. Although Monter's petition is not included in the record, its contents are not in dispute.

A. Yes.

Q. Were you living with her?

A. No.

. . . .

Q. When you filed to adjust your status, did you claim that you were still living with your wife?

A. Yes.

Q. Did you file documents to show that you were living together?

A. Yes.

Q. What sort of documents?

A. Like a mortgage, the utility bills and a bank account and pictures.

. . . .

Q. When you filed to adjust your status . . . did you realize that by making false statements you were committing fraud?

A. Yes.

Q. Do you have anything you want to add to this statement?

A. We thought we were going to get back together.

Record of Sworn Statement, Mar. 31, 1998, at 4–5.[4] The exchange is followed by Monter's signature.

Monter was served with a "Notice to Appear" at removal proceedings to be held on August 5, 1998, in Buffalo, New York. The Notice charged that Monter "procured a benefit by fraud or by willfully misrepresenting a material fact." Notice to Appear, Mar. 31, 1998, at 2.

In a letter dated August 1, 1998, and filed two days later, Monter's counsel requested a change of venue for Monter's hearing from Buffalo to New York City. On August 5, an IJ nonetheless held a hearing in Buffalo. Neither Monter nor his counsel was present. At the hearing, counsel for the government did not contest Monter's motion for a change of venue:

> Because this case did come out of the New York [City] area and I believe the interview[5] took place in New York City, it looks like the approval of the I–485 [Application to Register Permanent Residence] initially, as well as the I–130 [Petition for Alien Relative] was in New York, I would think New York City is a good place for this matter to continue since any witnesses or any evidence would have to be obtained from the Immigration Service there. Therefore, I would not be opposed to an actual change of venue. . . .

Tr. of Removal Hr'g, Aug. 5, 1998, at 2–3 (footnote added). The IJ nonetheless denied Monter's motion for a change of venue. The IJ said that there was no assurance that Monter was still in the United States. He further commented: "I have other misgivings about this matter" because the motion to change venue, having been filed two days before the hearing, "was not filed . . . on a timely basis." *Id.* at 4. He noted that neither Monter nor his lawyer had notified the INS that they would not appear at the Buffalo hearing, and that no exceptional circumstances excusing this failure were apparent. Rather than order Monter removed *in absentia,* however, the IJ rescheduled the hearing for January 27, 1999.

Monter's counsel appeared at the postponed hearing. He admitted, on his client's behalf, some of the allegations against Monter, but denied "that [Monter] made a willful material misrepresentation [to the INS]." Tr. of Removal Hr'g, Jan. 27, 1999, at 7–8. He also argued in sup-

---

**4.** We note that the Exhibit is incorrectly dated March 31, 1997. The statement was taken on March 31, 1998.

**5.** Although it is not entirely clear from the record, the government appears to be referring to an interview prior to the grant of conditional permanent residency to Monter.

port of a renewed motion for a change of venue to New York City. He asserted that the key issue in Monter's case was "whether [a] misrepresentation appears [in the I-751 Petition] and if so, whether such misrepresentation was material." *Id.* at 9.

Noting that a key piece of evidence in the case was Monter's signed statement taken by immigration officials in Buffalo, Monter's counsel acknowledged that the statement

> is in fact [Monter's] statement, that [Monter] made it, that he knew he made it and that he would have no objection to it being received in evidence in this case so that the testimony of the [Buffalo] officers as to his condition at the time he made it or that he made it, would not be necessary at a trial.

*Id.* Monter's counsel further stipulated to the admissibility of the I-751 and other documents tendered by the INS to the IJ. Because "the Government's interest would be protected by [Monter's] stipulations," Monter's counsel argued that the "respondent's interest in having the trial where he lives and his wife, who is a critical witness, lives, would weight ... the balance of moving the case down to New York City, which has the most nexus to the issues to actually be tried." *Id.* at 10.

The government seemed willing, as it had been previously, to consent to the venue change "in view of the fact that there is no objection by [Monter] and his

counsel to the admission [of his statement to the Buffalo INS officers] at the ultimate trial, as well as to the admission of the [record of the interview]." *Id.* at 11. But the IJ would not permit a change of venue based on Monter's stipulation. He concluded that "[u]nless there is a complete and unconditional acquiescence in the charges, I'll have to leave it in Buffalo and we'll just have to sort it out here." *Id.* at 16.[6] He explained that "at this time I've just got a real funny feeling about" permitting a change in venue. *Id.* at 23–24.

The IJ therefore denied Monter's request for a change of venue. The IJ's written order stated: "Factual allegations have not been admitted nor removability conceded." Order of the Immigration Judge, Jan. 21, 1999.[7] The IJ again rescheduled Monter's hearing, this time for May 11, 1999, again in Buffalo.

Approximately one week before the May 11, 1999, hearing, in a motion dated May 3 and filed on May 5, Monter, through counsel, moved to terminate the proceedings, arguing that a marriage may be bona fide even though it later becomes nonviable, that Monter's marriage was in fact a bona fide marriage, and that the omission from his I-751 Petition of the fact that he and his wife had separated was not a material misrepresentation. Monter submitted in support of his motion an affidavit from Jennifer Monter, still his wife, attesting to

---

**6.** Returning to the issue of admissibility, the IJ said that "[i]f there is a question as to ... the integrity of the document [containing Monter's statement], its substance, its forum, its knowing, intelligent and voluntary execution then we, we've got to fly witnesses around and the forum, then it becomes a matter of forum not inconvenience [sic] and it, with all due respect, should remain in the forum where it was taken and that's here." *Id.* at 17–18. After further discussion, the government announced that although it was

(of course) willing to "leave the decision to the sound discretion of the [Immigration] Court, .... it does appear that [Monter's attorney] is and has articulated that there will not be an attack on the statement itself and [the Buffalo-based] Immigration Inspector." *Id.* at 23.

**7.** The order appears to be incorrectly dated, as the hearing was conducted on January 27, 1999.

the bona fides of their marriage.[8] The IJ denied Monter's motion to terminate as untimely.[9]

On May 10, 1999, the day before the rescheduled hearing, Monter moved to adjourn and continue the proceedings on the grounds that his wife "just learned that she cannot appear on May 11th" and that "a subpoena may be required." Mot. to Adjourn and Continue Removal Proceedings for Presence of Witness, May 10, 1999. According to the motion, Monter's wife had learned that day that she would "have to" attend a work-related conference the following day.

Although the government did not oppose the adjournment, the next day the IJ denied the motion as untimely. The hearing was held without the presence of Mrs. Monter. The IJ also refused to consider her affidavit, stating that if Monter had thought that Mrs. Monter was an unwilling witness, he should have notified the court in advance rather than waiting until the last minute to declare that a subpoena might be required. The IJ also declined to consider various documents that Monter's counsel attempted to enter into evidence because, under local rules governing the hearing, all documents intended to be introduced at trial must be submitted to the IJ at least ten days in advance.

At the hearing, Monter admitted that, although he had indicated in his I–751 Petition that he and his wife were then residing at the same address, they were in fact living separately. The IJ concluded that Monter had therefore procured removal of the conditions of his residence by fraud and ordered Monter removed from the United States.

On June 8, 1999, Monter timely appealed the IJ's decision to the BIA. Monter argued that the government had not met its burden of proof to show that his marriage was not bona fide, and that the IJ had misapplied the law in concluding that the misrepresentation on Monter's I–751 form was material. He also argued that the IJ erred in denying Monter's motions for a change of venue.

On December 9, 2002, in a per curiam opinion, the BIA affirmed the IJ's decision. It concluded that Monter suffered no prejudice from the denial of his motion for a change of venue because his wife had been, in any event, unavailable the day of the hearing. The BIA reasoned that even if the hearing had been held in New York City instead of Buffalo, she still would

---

**8.** The affidavit of Jennifer Monter states in relevant part:

7. Bogar and I separated on January 4 or 5, 1997. I asked him to leave the house (purchased jointly) for what we both believed to be a temporary separation. I requested the separation because of my unhappiness in our marriage. My husband prescribed to strict, traditional gender roles.

8. We continued to see each other about 3–4 times a month. We talked weekly. Several times we discussed reconciliation, but no compromise was met [sic]. The final reconciliation attempt was made on December 5, 1997 when I called Bogar in Mexico. I asked him if he would do certain things and that if he agreed to this then I wanted to go to counseling and put our marriage back together. He did not choose to work under my conditions.

9. At the present time, Bogar and I are, and plan to be, friends. We speak about 1–2 times a month. However, I now believe our relationship is beyond repair and plan to file for divorce in the next six months. I have failed to do so previously due to the intense emotion of this personal tragedy. I did not feel that I was ready to make such an important decision.

Aff. of Jennifer Monter, Apr. 26, 1999 (Ex. F to Mot. to Terminate Removal Proceedings, May 3, 1999).

**9.** Monter has not petitioned for review of this denial.

have been unable to attend. The BIA also agreed with the IJ that "by giving false information concerning his separation from his wife, [Monter] procured a benefit under the Immigration and Nationality Act by willfully misrepresenting a material fact." *In re Monter*, A73–496–973 (B.I.A. Dec. 9, 2002) (per curiam). The BIA decided that Monter's separate residence was a material fact, the omission of which made Monter removable—even if knowledge of Monter's separation would not necessarily have led the INS to deny Monter's Petition.

In his petition to this Court, Monter argues that his misrepresentation was not material and that, even if it was, the BIA abused its discretion in concluding that the law requires deportation without considering "any evidence surrounding the separation and the bona fides of [Monter's] marriage." Pet'r's Opening Br. at 5. Monter also contends that the IJ abused his discretion in denying Monter's motions for a change of venue and for a continuance so that his wife would be able to attend the hearing and testify. Finally, Monter argues that the IJ failed to inform him of his eligibility for other forms of relief available to him, such as voluntary departure.

## DISCUSSION

### I. Standard of Review

■■■ We "accord substantial deference to the [BIA's] interpretations of the statutes and regulations that it administers." *Michel v. INS*, 206 F.3d 253, 262 (2d Cir. 2000). However, "when the situation presented is the BIA's application of legal principles to undisputed facts, rather than its underlying determination of those facts

or its interpretation of its governing statutes, our review … is *de novo*." *Diallo v. INS*, 232 F.3d 279, 287 (2d Cir.2000) (internal quotation marks and citation omitted).

### II. The Supreme Court's Definitions of "Material" and "Procure"

8 U.S.C. § 1182(a)(6)(C)(i) includes in the category of persons who are ineligible to receive visas or to be admitted to the United States "[a]ny alien who, by fraud or willfully misrepresenting a material fact, seeks to procure (or has sought to procure or has procured) a visa, other documentation, or admission into the United States or other benefit provided under this chapter." *Id.* And 8 U.S.C. § 1227(a)(1)(A) states that "[a]ny alien who at the time of entry or adjustment of status was within one or more of the classes of aliens inadmissible by the law existing at such time is deportable." These statutory provisions are directly applicable to administrative removal processes, such as Monter's, in which the government begins a proceeding against an alien before an IJ.

■■■ The general rule is that a concealment or misrepresentation is material if it "has a natural tendency to influence or was capable of influencing, the decision of the decisionmaking body to which it was addressed." *Kungys v. United States*, 485 U.S. 759, 770, 108 S.Ct. 1537, 99 L.Ed.2d 839 (1988) (internal quotation marks and citation omitted). In *Kungys*, the Supreme Court analyzed a materiality requirement in the context of judicial denaturalization proceedings [10] brought under 8

---

10. "Denaturalization proceeding" refers to an action brought by the government in federal district court charging that an individual unlawfully became a naturalized citizen through the concealment of a material fact or by willful misrepresentation. *See, e.g., United States v. Oddo*, 314 F.2d 115, 116 (2d Cir.), *cert. denied*, 375 U.S. 833, 84 S.Ct. 50, 11 L.Ed.2d 63 (1963).

U.S.C. § 1451(a).[11] It settled on the same uniform definition of "material" that is typically used in interpreting criminal statutes. The Court reasoned that "[w]hile we have before us here a statute revoking citizenship rather than imposing criminal fine or imprisonment, neither the evident objective sought to be achieved by the materiality requirement, nor the gravity of the consequences that follow from its being met, is so different as to justify adoption of a different standard." *Kungys*, 485 U.S. at 770, 108 S.Ct. 1537; *see also United States v. An Antique Platter of Gold*, 184 F.3d 131, 136 (2d Cir.1999), *cert. denied sub nom. Steinhardt v. United States*, 528 U.S. 1136, 120 S.Ct. 978, 145 L.Ed.2d 929 (2000); *United States v. Wu*, 419 F.3d 142, 144 (2d Cir.2005).

Finding that a false statement was "material," however, does not end the court's inquiry. The *Kungys* Court observed that 8 U.S.C. § 1451(a) "plainly contains four independent requirements: the naturalized citizen must have misrepresented or concealed some fact, the misrepresentation or concealment must have been willful, the fact must have been material, and the naturalized citizen must have procured citizenship as a result of the misrepresentation or concealment." *Kungys*, 485 U.S. at 767, 108 S.Ct. 1537. If a court concludes that the misrepresented or concealed fact is "material," then it must determine whether the fourth section 1451(a) requirement is met—namely whether the applicant "procured" his or her citizenship by means of those misrepresentations or concealments. *Id.* at 776, 108 S.Ct. 1537.

In order to satisfy this fourth part of the test, the government need not establish that "but for" the misrepresentation, the petitioner would not have achieved naturalization. *Id.* Instead, the *Kungys* Court concluded that the government's showing of "materiality" creates a presumption that the petitioner was disqualified from naturalization: "Though the 'procured by' language of the present statute cannot be read to *require* proof of disqualification, we think it can be read to express the notion that one who obtained his citizenship in a proceeding where he made material misrepresentations was *presumably* disqualified." *Id.* at 777, 108 S.Ct. 1537 (emphases in original).

The *Kungys* Court continued, however:

The importance of the rights at issue leads us to conclude that the naturalized citizen should be able to refute that presumption, and avoid the consequence of denaturalization, by showing, through a preponderance of the evidence, that the statutory requirement as to which the misrepresentation *had a natural tendency* to produce a favorable decision was in fact met.

*Id.* at 777, 108 S.Ct. 1537 (emphasis in original). Thus, for the fourth *Kungys* requirement, once the government establishes "materiality," a presumption arises against—and the burden of persuasion shifts to—the subject of the denaturalization proceeding regarding whether he or she is statutorily "disqualified." *Id.* That person may refute the presumption by establishing that he or she did in fact meet

---

11. That statute reads, in pertinent part:

It shall be the duty of the United States attorneys for the respective districts, upon affidavit showing good cause therefor, to institute proceedings in any district court of the United States in the judicial district in which the naturalized citizen may reside at the time of bringing suit, for the purpose of revoking and setting aside the order admitting such person to citizenship and canceling the certificate of naturalization on the ground that such order and certificate of naturalization were illegally procured or were procured by concealment of a material fact or by willful misrepresentation. . . .

8 U.S.C. § 1451(a).

the statutory qualification that the misrepresentation had a tendency to influence.

Although we have no doubt that *Kungys*'s definition of "materiality" applies here,[12] we cannot automatically import its rebuttable presumption and burden-shifting framework to interpret the term "procure" as used in the statute that governs Monter's case.[13] *Kungys* analyzed the word "procure" for purposes of 8 U.S.C. § 1451(a), which involves denaturalization court proceedings, but Monter's petition concerns 8 U.S.C. § 1182(a)(6)(C)(i), which involves aliens' administrative applications. To be sure, both provisions are used in the same title of the United States Code in the immigration context (Title 8: "Aliens and Nationality") and are used for similar purposes. They also contain strikingly similar wording. *Compare* 8 U.S.C. § 1451(a) (providing for "revoking and setting aside the order admitting [a] person to citizenship and canceling the certificate of naturalization on the ground that such order and certificate of naturalization were *illegally procured or were procured by concealment of a material fact or by willful misrepresentation*") (emphasis added), *with* 8 U.S.C. § 1182(a)(6)(C)(i) ("Any alien who, *by fraud or willfully misrepresenting a material fact, seeks to procure* (or has sought to procure or has procured) a visa, other documentation, or admission into the United States or other benefit

---

**12.** Although the Supreme Court has declined to state whether the definition of "material" in denaturalization proceedings also applies in the section 1182 context, *see Fedorenko v. United States,* 449 U.S. 490, 509, 101 S.Ct. 737, 66 L.Ed.2d 686 (1981), we think that it does. In a decision of this Court prior to *Kungys,* when the Supreme Court's decision in *Chaunt v. United States,* 364 U.S. 350, 81 S.Ct. 147, 5 L.Ed.2d 120 (1960), provided the prevailing definition of "material" in the denaturalization context, we noted that "[a]lthough the Supreme Court [had at that time] declined to resolve the issue of whether *Chaunt*'s materiality test for citizenship revocation applie[d] to misrepresentations at the visa stage, all of the Courts of Appeals that [had] considered the issue [had] deem[ed] the *Chaunt* test applicable to misrepresentations in visa application documents." *Maikovskis v. INS,* 773 F.2d 435, 441 (2d Cir.1985), *cert. denied,* 476 U.S. 1182, 106 S.Ct. 2915, 91 L.Ed.2d 544 (1986) (internal citation omitted). We do not think that *Maikovskis*'s conclusion that the standard for materiality is the same for both denaturalization and removal proceedings has been undermined by the change from *Chaunt* to *Kungys. See also Forbes v. INS,* 48 F.3d 439, 442–43 (9th Cir. 1995) (specifically applying *Kungys*'s definition of "material" in proceedings under section 1182).

**13.** The Ninth Circuit, in *United States v. Puerta,* 982 F.2d 1297, 1303–04 (9th Cir.1992), reviewed the *Kungys* decision and concluded that Justice Brennan's view of materiality, described in a concurring opinion, controls. Justice Brennan, the Ninth Circuit concluded, had "apparently viewed his opinion as a narrowing construction of Justice Scalia's opinion," and because his was the fifth vote required to establish a "controlling" standard, his view therefore represented the holding of the Court. *Puerta,* 982 F.2d at 1304.

While we agree with much of the Ninth Circuit's analysis, we think the dispute between Justices Brennan and Scalia concerned the proper interpretation of "procure" not "material." In other words, it involved step 4, not step 3. In *Kungys,* Justice Brennan wrote:

> I wish to emphasize, however, that in my view a presumption of ineligibility does not arise unless the Government produces evidence sufficient to raise a fair inference that a statutory disqualifying fact actually existed.... Evidence that simply raises the possibility that a disqualifying fact might have existed does not entitle the Government to the benefit of a presumption that the citizen was ineligibile [sic]....

*Kungys,* 485 U.S. at 783–84, 108 S.Ct. 1537 (Brennan, J., concurring). The discussion of a presumption arose only in step 4 of the Court's analysis. Thus, while Brennan's opinion may be controlling with respect to interpreting the word "procure," it in no way conflicts with the lead opinion's definition of "materiality."

provided under this chapter is inadmissible.") (emphasis added). But the government argues that the two types of proceedings are substantially different and that the standard adopted in *Kungys* is appropriate only for judicial denaturalization proceedings, which involve the potential divestiture of citizenship rights, not for administrative removal proceedings, which concern only the applicant's permanent resident status.

The government is correct that in *Kungys*, all the Justices acknowledged the drastic nature of stripping a person of United States citizenship.[14] But the Supreme Court has also noted that in some circumstances the deportation of a permanent resident may be at least as severe.

> The immediate hardship of deportation is often greater than that inflicted by denaturalization, which does not, immediately at least, result in expulsion from our shores. And many resident aliens have lived in this country longer and established stronger family, social, and economic ties here than some who have become naturalized citizens.

*Woodby v. INS,* 385 U.S. 276, 286, 87 S.Ct. 483, 17 L.Ed.2d 362 (1966). Administrative deportation hearings accordingly employ the same requirements of proof by "clear, unequivocal, and convincing evidence" as do denaturalization and expatriation cases. *Id.; see also Berenyi v. Immigration Dir.,* 385 U.S. 630, 636, 87 S.Ct. 666, 17 L.Ed.2d 656 (1967) ("When the Government seeks to strip a person of citizenship already acquired, or deport a resident alien and send him from our shores, it carries the heavy burden of

proving its case by 'clear, unequivocal, and convincing evidence.' ... [T]hat status, once granted, cannot lightly be taken away ....") (footnotes omitted).

We therefore conclude that even though judicial denaturalization and administrative removal may be substantially different in many respects, the difference does not support divergent readings of the word "procure" as used in the phrase (1) "illegally procur[ing] ... by concealment of a material fact or by willful misrepresentation" a certificate of naturalization, interpreted by *Kungys,* and the phrase (2) "seek[ing] to procure" "by fraud or willfully misrepresenting a material fact" "a visa, [or] other documentation," which governs Monter's administrative proceeding. We conclude that *Kungys* provides the meaning of "procure" for both statutes: "Though the 'procured by' language ... cannot be read to *require* proof of disqualification, ... it can be read to express the notion that one who obtained his citizenship [or "a visa, [or] other documentation"] in a proceeding where he made material misrepresentations was *presumably* disqualified." *Kungys,* 485 U.S. at 777, 108 S.Ct. 1537 (emphases in original).

■ Our conclusion is largely consistent with the few other courts that have explicitly considered the application of *Kungys* in the administrative-removal context. In *Kalejs v. INS,* 10 F.3d 441 (7th Cir.1993), *cert. denied,* 510 U.S. 1196, 114 S.Ct. 1305, 127 L.Ed.2d 656 (1994), the Seventh Circuit, applying the *Kungys* test, stated that if the government proved that the misrepresentation was material, then it "is

---

14. *See, e.g., Kungys,* 485 U.S. at 776, 108 S.Ct. 1537 (Opinion of Scalia, J.) (analyzing the statute while "[b]earing in mind the unusually high burden of proof in denaturalization cases"); *id.* at 783–84, 108 S.Ct. 1537 (Opinion of Brennan, J.) ("[C]itizenship is a most precious right and as such should never be

forfeited on the basis of mere speculation or suspicion." (citation omitted)); *id.* at 784, 108 S.Ct. 1537 (Opinion of Stevens, J.) ("American citizenship is 'a right no less precious than life or liberty.' For the native-born citizen it is a right that is truly inalienable." (citation omitted)).

deemed to have established a rebuttable presumption that the person got his visa because of the misrepresentation." *Id.* at 446. In *Solis–Muela v. INS*, 13 F.3d 372 (10th Cir.1993), even though the Tenth Circuit did not explicitly discuss *Kungys*'s rebuttable presumption, the court stated that "[h]ad the consular officer known of [the petitioner's] conviction and sentence, he would have found him excludable." *Id.* at 377. Both rulings are thus compatible with our determination that where an immigration court finds that an alien has made a material misrepresentation, the IJ must also determine whether that alien has rebutted the resulting presumption that he or she would have been removable if the true facts had been known to the INS.

■ The government, in its supplemental letter brief, appears to embrace a similar approach. Although it urges us to apply "*Chevron* deference" to the BIA's definition of "materiality" and not to apply the definition adopted in *Kungys*, the government also states:

> [A] material misrepresentation is one which "tends to shut off a line of inquiry which is relevant to the alien's eligibility and which might well have resulted in a proper determination that he be excluded." *Matter of S– and B–C–*, 9 I & N Dec. [436,] 447 [, 1960 WL 12154 (B.I.A. 1961)]. The government bears the burden of proving by clear and convincing evidence "that facts possibly justifying denial of a visa or admission to the United States would have likely been uncovered and considered but for the misrepresentation." *Matter of Bosuego*, 17 I & N Dec. [125,] 131 [, 1979 WL 44373 (B.I.A.1980)]. *The burden then shifts to the alien to demonstrate that "no proper determination of inadmissibility could have been made." Id.*

Gov't's Ltr. Br., July 5, 2005, at 12 (emphasis added). Thus, the government appears to acknowledge that an immigration court's conclusion that an alien has made a material misrepresentation is not the end of the inquiry. We agree. Once such a finding has been made, the burden shifts to the alien, who has the opportunity to demonstrate that, on the facts accurately stated, he or she would not be removable.

### III. Monter's Case

### A. *Monter's Misrepresentation*

■ Monter understandably attempts to downplay the significance of the misrepresentation in his I–751 Petition. He contends that (1) he simply omitted the fact of separation, and therefore it was not a misrepresentation; (2) the I–751 Form does not specifically ask about separation, and therefore his omission was understandable; and (3) he actually did check a box indicating that he had lived at "[an]other address since [he] became a permanent resident," rendering it doubtful that he made any misrepresentation in the first place. *See* Pet'r's Opening Br. at 10. But those arguments contradict Monter's sworn statement to the IJ that he was aware he was committing fraud at the time he filed his Petition. They also conflict with the I–751 Petition itself, which asks for the address of the conditional permanent resident and, separately, the address of "the spouse or parent through whom [the alien] gained [his] conditional residence." The form's inquiry as to whether the alien has lived at another address seems designed to uncover address changes and confusions, not to assist in determining whether an alien is separated from his United States-citizen spouse.

We conclude that under the definition provided in *Kungys*, this misrepresentation was material. Monter's failure to state that he was living separately from his

wife "was predictably capable of affecting, *i.e.*, had a natural tendency to affect, the official decision." *Kungys,* 485 U.S. at 771, 108 S.Ct. 1537. The fact of Monter's separation was clearly linked to a statutory ground for removability: The knowledge that Monter and his wife lived in separate residences would lead investigators to question the bona fides of their marriage. Monter's omission likely affected the INS's scrutiny of his I–751 Petition—and perhaps even its ultimate decision to grant it.

■ As we have explained, however, materiality is not the end of the inquiry. Under *Kungys,* if the government has successfully established the existence of a material misrepresentation, there is only a presumption of removability, one that Monter may be able to rebut.[15] Neither the IJ nor the BIA gave Monter that opportunity. Indeed, neither acted as though it had the responsibility to do so. After concluding that "the separation was a material fact," the BIA bypassed the fourth step of the inquiry, concluding simply: "Accordingly, the appeal is dismissed." *In re Monter,* A73–496–973 (B.I.A. Dec. 9, 2002) (per curiam). We think that this conclusion was premature and therefore erroneous.

There is no way for us to know whether Monter could have marshaled the evidence to rebut the presumption by "showing, through a preponderance of the evidence, that the statutory requirement as to which the misrepresentation had a natural tendency to produce a favorable decision [i.e., bona fide marriage] was in fact met." *Kungys,* 485 U.S. at 777, 108 S.Ct. 1537 (emphasis omitted). But without the testimony of his wife, Jennifer, and especially in light of the IJ's exclusion of her affidavit from evidence, it is difficult to see how Monter could begin to rebut the presumption in the circumstances of this case. It is in this context that we examine the BIA's determination that Monter suffered no prejudice from the IJ's denial of his motion for a change of venue.

### B. Monter's Motion to Change Venue

■ Monter argues that the IJ erred when he denied Monter's motion for a change of venue to New York City, a location nearer to where Monter's wife resided. We review the BIA's affirmance of the IJ's decision for abuse of discretion. *See Lovell v. INS,* 52 F.3d 458, 460 (2d Cir.1995) ("A decision regarding venue is discretionary, and is reviewable only for abuse of discretion.").

---

**15.** As the Ninth Circuit has pointed out, *see Puerta,* 982 F.2d at 1303–04, there is some dispute over whether Justice Brennan's concurrence required a heightened showing in order to trigger this presumption. Justice Brennan said that "a presumption of ineligibility does not arise unless the Government produces evidence sufficient to raise a fair inference that a statutory disqualifying fact actually existed." *Kungys,* 485 U.S. at 783, 108 S.Ct. 1537 (Brennan, J., concurring). Although the Ninth Circuit thought that this test was in tension with Justice Scalia's lead opinion, *see Puerta,* 982 F.2d at 1303, Justice Brennan noted that "nothing in the Court's opinion is inconsistent with this standard ...." *Kungys,* 485 U.S. at 784, 108 S.Ct.

1537. In order to meet Justice Scalia's definition of "material" in step 3, the misrepresented information must predictably have triggered further investigation by giving "cause to believe that the applicant was not qualified." *Id.* at 774 n. 9, 108 S.Ct. 1537. We are not convinced that there is a meaningful distinction between these two standards. We would think that concealed facts that "g[i]ve cause to believe that the applicant was not qualified" (Opinion of Scalia, step 3) would also "raise a fair inference that a statutory disqualifying fact actually existed" (Opinion of Brennan, step 4). In any event, Monter's misrepresentations would satisfy either standard.

■ An IJ may change venue "for good cause" upon a motion by a party. 8 C.F.R. § 1003.20(b). "Good cause is determined by balancing such factors as administrative convenience, the alien's residence, the location of witnesses, evidence and counsel, expeditious treatment of the case, and the cost of transporting witnesses and evidence to a new location." *Lovell*, 52 F.3d at 460.

■ Even if an IJ abuses his or her discretion, "an incorrect decision under that regulation would entitle petitioner to a remand only if he [could] show that it caused him prejudice." *Id.* at 461 (citing *Waldron v. INS*, 17 F.3d 511, 518 (2d Cir.), *cert. denied*, 513 U.S. 1014, 115 S.Ct. 572, 130 L.Ed.2d 489 (1994)). "In order to demonstrate prejudice, petitioner must show that the denial of the venue change affected either the outcome or the overall fairness of the . . . proceeding." *Id.*

■ The BIA determined summarily, and without considering the fourth step of the misrepresentation inquiry, that the denial of Monter's motion to change venue did not cause him prejudice. The BIA remarked only, "We find no merit to [Monter's] argument, where the record establishes that his key witness, his wife, did not attend the respondent's hearing because she was at a conference that day." *In re Monter*, A73–496–973 (B.I.A. Dec. 9, 2002). But the record does not establish that Monter's wife would have been unable to testify decisively on Monter's behalf had the hearing been transferred to a more easily accessible forum. The BIA erred in not concluding that the IJ's failure to facilitate Monter's wife's testimony "affected the overall fairness of the proceeding" and therefore was prejudicial.

We concede skepticism about Monter's explanation that Jennifer Monter could not attend a hearing a state's-width away to save her husband from removal from the United States because of a barely explained work-related conference. But given the high stakes, we are not prepared to dismiss out of hand Monter's assertion that he should have been given a better chance to obtain her testimony. The prejudice Monter likely suffered by not having, for whatever reason, the benefit of his wife's evidence is plain. Mrs. Monter was a signatory to the I–751 Petition containing Monter's misrepresentation, and her affidavit, which the IJ refused to consider, generally corroborated Monter's testimony about the state of their relationship. *See* Aff. of Jennifer Monter, April 26, 1999 (Ex. F to Mot. to Terminate Removal Proceedings, May 3, 1999).

Nearly all of the factors identified in *Lovell v. INS, supra*, as to whether a change of venue is appropriate appear to weigh heavily in Monter's favor. Monter's address at the time of the hearing was in Larchmont, New York, about .25 miles from New York City, but 415 miles from Buffalo.[16] *See* Mot. for Change of Venue, Jan. 14, 1999, at 2. His principal witness, his wife Jennifer, resided in Warwick, New York, again significantly closer to New York City than to Buffalo.[17] Nor did there appear to be a need, in light of Monter's stipulations, to transport the Buffalo INS officer to any hearing in New York.

The evidence on the only contested issue, whether Monter's marriage was bona fide, was thus demonstrably and signifi-

---

**16.** By the time of the May 11, 1999, hearing, Monter had moved to New Rochelle, New York, also on the outskirts of New York City.

**17.** According to http://www.mapq uest.com, Warwick is 56 miles from New York City, and 365 miles from Buffalo. *See* http:// www.mapq uest.com/direct ions/.

**560**

cantly closer to New York City than it was to Buffalo. *See* Mot. for Change of Venue, Jan. 14, 1999, at 1. Indeed, as we have noted, the government's advocate herself was satisfied with a venue change. *See* Tr. of Removal Hearing before Immigration Judge Philip Montante, Aug. 5, 1998, at 2. Only the IJ, apparently not fully appreciating the nature of the fourth step of the materiality inquiry, was unpersuaded. We do not think that his "real funny feeling about" such a transfer, *See* Tr. of Removal Hearing before Immigration Judge Philip Montante, Jan. 27, 1998, at 24, was, under the circumstances, a proper basis for exercising his discretion to deny the motion. In light of this abuse of discretion, we grant the petition in part, vacating the order of the BIA and remanding with instructions for it, in turn, to vacate the IJ's order and remand with instructions to the Immigration Court to grant Monter's request for a transfer of this matter to New York City for his hearing.[18]

### CONCLUSION

For the foregoing reasons, we deny Monter's petition insofar as it asserts that his misrepresentation was not "material." We grant his petition to the extent that it asserts that (1) the BIA erred in not recognizing that Monter should have been afforded the opportunity to rebut the presumption of removability established by the government; and (2) the BIA abused its discretion in concluding that Monter was not prejudiced by the IJ's denial of Monter's motion for a transfer of his case to New York City. We vacate the BIA's order in part and remand Monter's case to

the BIA for further proceedings consistent with this opinion.

---

**18.** In light of this conclusion, we choose not to reach at this time Monter's argument—which he did not raise in his appeal to the BIA—that the IJ abused his discretion when he denied his motion for a continuance. We also need not and do not reach Monter's assertion that the IJ should have advised him on the availability of other relief from removal, since Monter also did not raise this claim before the BIA. *See Foster v. INS,* 376 F.3d 75, 77 (2d Cir.2004).