

2007 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

5-17-2007

# Johnson v. Atty Gen USA

Precedential or Non-Precedential: Non-Precedential

Docket No. 04-1575

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2007

Recommended Citation

"Johnson v. Atty Gen USA" (2007). *2007 Decisions.* Paper 1096.
http://digitalcommons.law.villanova.edu/thirdcircuit_2007/1096

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2007 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

Nos: 04-1575, 05-3579, 05-4569

DAVID JOHNSON,
Petitioner

v.

ATTORNEY GENERAL OF THE UNITED STATES;
DEPARTMENT OF HOMELAND SECURITY
(Agency No. A76 019 731)

05-3579
DAVID JOHNSON
v.
WILLIAM RILEY, PHILADELPHIA DISTRICT DIRECTOR,
IMMIGRATION AND CUSTOMS ENFORCEMENT; DEPARTMENT
OF HOMELAND SECURITY; ATTORNEY GENERAL OF THE
UNITED STATES
(D.C. No. 04-cv-02523)

DAVID JOHNSON
v.
ATTORNEY GENERAL OF THE UNITED STATES
DEPARTMENT OF HOMELAND SECURITY
(D.C.No. 04-cv-04443)

David Johnson,
Appellant

05-4569

DAVID JOHNSON,
Appellant

v.

ATTORNEY GENERAL OF THE UNITED STATES;
DEPARTMENT OF HOMELAND SECURITY

Consolidated Appeal from

The United States District Court
for the Eastern District of Pennsylvania,

(D.C. Case Nos. 04-cv-02523,  04-cv-04433 )

District Judge:  Legrome D. Davis


and


The Immigration & Naturalization Service

(INS Case No. A-76-019-731)

Argued: May 19, 2006

Before: McKEE and STAPLETON, Circuit Judges
and McCLURE, District Judge[*]


(Opinion filed: May 17, 2007)


David V. Bernal
Ernesto H. Molina, Jr. (Argued)
Linda S. Wernery
William C. Peachey
U.S. Department of Justice
Office of Immigration Litigation
P.O. Box 878
Ben Franklin Station
Washington, D.C. 20044

---

[*]  The Honorable James F. McClure is sitting by designation from the Middle District of Pennsylvania.

2

Joel M. Sweet
Office of United States Attorney
615 Chestnut Street
Suite 1250
Philadelphia, PA 19106
Attorneys for Respondent/Appellee

Joseph C. Hohenstein (Argued)
Orlow & Orlow
620 Chestnut Street
Suite 656
Philadelphia, PA 19106
Attorney for Petitioner/Appellant


OPINION

McKEE, Circuit Judge

David Johnson[1] petitions for review of the final order of the Board of Immigration Appeals dismissing his appeal from a decision of an Immigration Judge ordering his removal (04-1575). That appeal is consolidated with his appeal of a final Order of the United States District Court for the Eastern District of Pennsylvania entering judgment against him in a declaratory action Johnson filed pursuant to 28 U.S.C. § 2201 (05-4569) in an attempt to have that court declare that he is a citizen of the United States.[2]

---

[1] Appellant's identity and parentage are vigorously contested. As we discuss below, Appellant claims he is actually "Troy Jenkins," and that his parentage and citizenship are both unknown. The government claims he is "David Johnson," and that he is the Jamaican born child of a Jamaican citizen. For the sake of clarity and consistency, we will refer to Appellant as "David Johnson" except where the context lends itself to referring to him otherwise.

[2] Johnson also appealed the denial of his petition for habeas relief (05-3579). However, his brief does not address that claim. Accordingly, it is waived and need not be

3

For the reasons that follow, we will grant the petition for review and remand that matter to the BIA with instructions to vacate the order opening the removal proceedings, and reinstating its order affirming the decision of Immigration Judge Van Wyke. However, we will affirm the order of the District Court entering judgment against Johnson on his declaratory judgment action.[3]

## I. **BACKGROUND**

We will elaborate upon the details of this dispute when we discuss the findings of the Immigration Judges. However, some preliminary background, though redundant, is helpful at the outset.

The government claims that Appellant is "David Johnson," that he was born in Jamaica in October of 1982, and that since his mother, "Hazel Francis," was Jamaican, he is also a citizen of Jamaica. Johnson claims that his real name is "Troy Jenkins" and that his citizenship, date of birth, place of birth, and the identity of his mother remain unknown and unproven.

It all began in Brooklyn when Johnson's brother, "Robert Cross" (a/k/a/ "Lizard"),

---

discussed.

[3] We understand that this ruling leaves Johnson in legal limbo. He can not prove that he is a citizen of the United States, and the government can not establish that he is not a citizen of the United States. However, Johnson's counsel indicated at oral argument that he has identified applicable procedures for Johnson to obtain lawful residence and employment in the United States in the event that the appeals resulted in the legal limbo that now confronts Johnson.

left Johnson in the care of a neighbor, Ethel White in the spring of 1987.[4] White knew Johnson as "Troy." That is what Cross called him, and that is how Johnson referred to himself. Not long after Cross left Johnson with White, she learned that Cross had been murdered. A month after Cross was killed, police gave White a birth certificate that they found in the home of Robert Cross during the investigation. The birth certificate was for "David Lloyd Johnson," who was born to Hazel Francis on October 8, 1982 in Kingston, Jamaica.

White made inquiries in an attempt to find someone else to care for Johnson, but her efforts were fruitless. Accordingly, Johnson continued to live with White who acted as his guardian as he grew up. Since White had no official records to establish Johnson's age or identity, she used the birth certificate police found to enroll him in school. Thus, all of his school records bore the name, "David Johnson," and that was how he was known throughout his years in school.

Although Johnson stayed with White for several years, he was a troubled teen and left home when he was about 15. Thereafter, he began having scrapes with the law and with juvenile authorities. In 1998, he was charged with selling cocaine, and in 1999, he was accused of criminal possession of a weapon. Both offenses were handled through the juvenile and youthful offender systems of New York. His juvenile records listed his date

---

[4] There is some conflicting testimony about when Cross brought Johnson to stay with White. Her recollection was that Johnson came to stay with her sometime during the spring of 1987. However, it appears that she was mistaken about the year.

of birth as October 8, 1983 and listed his name as "David T. Johnson."

Johnson's juvenile arrests brought him to the attention of the immigration authorities.  In June 1999, while in custody, Johnson was interviewed by Agent Doughty of the Immigration and Naturalization Service.[5]  Thereafter, the INS initiated removal proceedings against Johnson, claiming that he was removable as an alien convicted of a crime involving moral turpitude.  The first immigration hearing followed.

## A. THE FIRST REMOVAL HEARING

At Johnson's initial hearing, Immigration Judge Van Wyke  allowed Ethel White to testify via telephone because poor health made it difficult for her to appear in person. She testified that she first met Johnson in 1987 and thought he was four years old.  She explained that he was known in the neighborhood as "Troy."  Troy thought that his real name was "David," but he wasn't really sure, and he once told a school psychologist that his last name was "Jenkins."   Johnson had a Jamaican accent when White first met him.

Johnson's brother, whom White knew only as "Lizard," occasionally dropped Johnson off at White's house to play with her grandchildren or to stay for the night. One

---

[5] On March 1, 2003, the Immigration and Naturalization Service ceased to exist as an independent agency within the Department of Justice and its functions were transferred to the newly formed Department of Homeland Security and placed under the Bureau of Immigration and Customs Enforcement. *See* Homeland Security Act, 116 Stat. 2135, Pub.L. 107-296 (2002). For the sake of simplicity, because relevant events occurred both before and after that change, we will refer to the Bureau of Immigrations and Customs Enforcement as well as the Immigration and Naturalization Service as the "INS," or the "government."

night Lizard dropped the boy off and never returned. White later learned that Lizard, whose real name was "Robert Cross," had been killed. Even though Johnson told White that his mother and sister were both dead, White nonetheless continued to hope someone would come for Johnson because Cross was married to a woman named "Diane Murphy," and Cross and Murphy had a child together.

When noone came for Johnson, he continued living with White. After the death of Robert Cross, police gave White a birth certificate they found in Cross's apartment during their investigation. The birth certificate contained the name, "David Lloyd Johnson," and had a birth date of "10/08/82." This surprised White because it meant that Johnson was five, a year older than she had always thought. Since that birth certificate was the only official document she had for Johnson, she used it to enroll him in school. Johnson continued living with White until he was about 15 when he ran away.

As noted earlier, Johnson came to the attention of immigration authorities in 1998, after being arrested for selling cocaine. Agent Doughty interviewed Johnson following that arrest.

Doughty testified and explained that he filled out an I-213 Form for Johnson after speaking with White and Johnson.[6] Doughty completed the I-213 using information

---

[6] An I-213 is a Record of Deportable Alien that is filed when an alien is arrested. The INS may prove alienage with an authenticated I-213 Form. *Lopez-Chavez v. INS*, 259 F.3d 1176, 1181 (9th Cir. 2001).

obtained from White and Johnson as well as information obtained from the birth certificate. According to Doughty, Johnson told him that he was born in Jamaica and his birthday was October 9, 1982. However, Doughty's notes also reflected the name "Troy Jenkins." Johnson's criminal records contained the name, "David T. Johnson," and listed his date of birth as October 8, 1983.

Johnson also testified before IJ Van Wyke. He explained that he did not know where he was born, and that he never saw the birth certificate when he was growing up. According to Johnson, prior to moving in with White, he only knew that his name was "Troy" He celebrated his birthday on October 8, and believed that he had been born in 1983. Johnson explained that, prior to living with White, he lived with his brother in the a building with several other relatives including four children who were believed to be his cousins. Johnson did not see the cousins very often after the death of his brother because his brother was shot by an older cousin. Johnson testified that he remembered going to Jamaica for his sister's funeral when he was around four.

The INS relied upon Agent Doughty's testimony, the I-213, and the contested birth certificate to argue that it had satisfied its burden of proving alienage and asking for an order removing Johnson to Jamaica based upon Johnson's criminal conviction.

On March 12, 2001, IJ Van Wyke ruled that the INS had not met its burden of proving that Johnson was an alien by clear and convincing evidence. Accordingly, the IJ held that Johnson was not removable, and he entered an order terminating removal

8

proceedings. The IJ reasoned that there was not "clear and convincing" evidence that the birth certificate belonged to Johnson. He rejected the purportedly definitive evidence of Johnson's identity, because it could all be traced back to the birth certificate. The IJ did not think the birth certificate sufficiently probative of alienage for several reasons. The last name on that certificate was not the same as Johnson's brother's last name ("Cross"), and the name of the mother recorded on the birth certificate did not correlate with either Johnson or his brother.[7] The certificate "had a different name . . . than [Johnson] was known by and was . . . simply part of the possessions in the apartment that he lived in with his brother before his brother was killed." A.R. 434-35.

IJ Van Wyke also dismissed the significance of Johnson's Jamaican accent because, although consistent with the government's contention that Johnson had been born in Jamaica, he could have acquired the accent "growing up in an environment with many Jamaican people in New York." A.R. 435.

---

[7] The IJ carefully considered possible explanations for this discrepancy. He concluded "[t]here can be explanations for that; his brother's last name may be . . . his brother's father's name; the respondent's last name of Johnson, if that indeed is his last name, would then be a mystery because his mother [according to the birth certificate] did not have the last name Johnson. Her name was Hazel Francis, if indeed the birth certificate belongs to the respondent. No father's name is given.
"In addition, the respondent continued using the name Troy throughout much of his youth and ended up stating that his name was David Troy Johnson as opposed to David Lloyd Johnson [as on the birth certificate]. It turns out that the rap sheet, . . . presented here have David T. Johnson, rather than David L. Johnson. One of the rap sheets also has place of birth information unknown." A.R. 435-36.

9

IJ Van Wyke also gave little weight to Johnson's 13-year old recollection of when he celebrated his birthday as a child. However, he thought White's testimony that she thought Johnson was older than the birth certificate suggested was significant and probative because White had raised children and grandchildren and would be able to determine age. The rest of the government's evidence was all derived from the birth certificate:

> The respondent's statements . . . to the Immigration Service which the Immigration Service put down on the I-213, the statements by Mrs. White, all go back to that one piece of paper, which had a different name on it other than what he was known by and was not given to [White] by any authoritative source as necessarily relating to the respondent, but was simply part of the possessions in the apartment that he lived in with his brother . . ..

A.R. 435.

IJ Van Wyke summarized his assessment of the government's proof as follows: "[i]f the Court were to place a bet based on this information . . . the Court would not be sure how to place it, but would lean toward saying that the respondent was born in Jamaica." A.R. 435.[8] The IJ then explained why that was not good enough:

> In the end, the Immigration Service must show deportability by clear and convincing evidence. The Court finds that the

_____

[8] As we will explain, the tenuous nature of the evidence of alienage is further illustrated by the fact that later in the same opinion, IJ Van Wyke expressed doubt about whether the evidence satisfied even the preponderance standard because the foundation for the government's case teetered upon a single document; the disputed birth certificate.

> evidence here is not clear and convincing that the respondent is a foreigner, i.e. that he was born in Jamaica. . . . [It] is not clear and convincing that the birth certificate that ended up being used for him to go to school by a person who did not know either his mother or his father and barely knew his purported brother, and knew him by a different name than is on that certificate, is the only link that we have between the respondent's possible birth in Jamaica and the person who is before me today. . . . [T]hat may not even come to a preponderance of the evidence and if it does, it certainly does not rise to the level of being clear and convincing.

A.R. 436-37. Accordingly, he concluded that the INS had not tied the birth certificate to Johnson by "clear and convincing" evidence. On March 12, 2001, IJ Van Wyke ordered the removal proceedings terminated, and Johnson was released.

Despite the IJ's ruling, on March 13, 2001, the day after Johnson was released, the government issued an I-94 "Arrival Record" to Johnson that stated that his "Country of Citizenship" was Jamaica.[9] The form was valid until "6/13/01." A second I-94 Departure Record was issued on April 4, 2001. That form also listed Johnson's "Country of

_____

[9] "An I-94 Form is an alien-arrival-departure record that serves as proof of the bearer's current immigration status and the time period during which his stay in this country is authorized. See 8 CFR § 229.1(1997) (prescribing the forms used by the INS). *Mariscal-Sandavol v. Ashcroft*, 370 F.3d 851, 853 n.4 (9th Cir. 2004). An I-94 Form lists arrival/departure date, date of birth, country of citizenship and the status of non-immigrant aliens.

11

Citizenship" as Jamaica and was also valid until "6/13/01." It contained the following notation: "New I-94 issued[.]"[10]

Meanwhile, the government petitioned the BIA for review of IJ Van Wyke's order discharging Johnson and terminating the removal proceedings.

### B. The BIA's Decision on the Merits

On appeal to the BIA, the government argued that "documents in evidence, . . . Form I-213 and the Jamaican birth certificate in the name of David Lloyd Johnson, establish that the respondent was born in Jamaica." A.R. 367. The BIA disagreed.

The Board agreed with IJ Van Wyke that the government's proof suffered a "fatal defect" because it did not "establish[] by clear and convincing evidence [that] the birth certificate reflects the true facts of the respondent's birth." A.R. 367. The Board explained: "In particular, it has not demonstrated that such birth certificate relates to the respondent. . . . [H]e has used first and last names and birth dates in the birth certificate as his own. Neither the testimony of respondent nor his guardian however establishes to the requisite level of proof that the birth certificate relates to him." *Id.* The Board noted that Johnson had not been informed of the details or circumstances of his birth and that, "as

---

[10] Johnson explains the issuance of two I-94 Forms nearly a month apart with the same expiration date. He claims that when he received the first I-94 stating that he was a citizen of Jamaica, he requested a new I-94 stating that his country of citizenship was "unknown" as the IJ had found. The INS then issued the second I-94. However, again contrary to IJ Van Wyke's decision, that form also stated that Johnson was a citizen of Jamaica.

12

long as he could remember he was known as Troy, not David Johnson and . . . he only began to use the name David Johnson when he started school, presumably because his guardian then used the birth certificate to enroll him." *Id*. The Board agreed that that was not sufficient to prove that the birth certificate referred to Johnson. *Id.*

The Board also agreed that White's testimony did not establish Johnson's alienage. "[S]he first met respondent when he was . . . approximately 4 [years old]. . .. [S]he did not know who respondent's parents were or where he was born." *Id*. The Board also noted that, according to White's testimony, "others including children had access to the apartment [where Johnson lived with Cross] and it was possible the [birth certificate] belonged to another." *Id.*

Finally, the BIA rejected the government's attempt to rely on the I-213. The Board explained: "[a]s the Form I-213 is based on the birth record, we find that it also is insufficient to establish the Service's case." *Id*.

Accordingly, the BIA dismissed the petition for review.

### C. The Motion to Reopen

In order to obtain employment, Johnson had to obtain a Social Security card. The application required identification and verification of certain information including one's citizenship. Johnson would later testify that he tried to leave questions pertaining to citizenship, place of birth, and date of birth blank when filling out the application, but

13

Social Security personnel informed him that nothing could be left blank and that the information had to be consistent with his I-94.

Since the only official documentation Johnson had consisted of the I-94 Forms and the disputed birth certificate, he answered the questions on the Social Security application in a manner that would be consistent with those forms and fully filled in the application.

Sometime after Johnson completed that application, it came to the attention of INS officials, and the INS relied upon it to file a Motion to Reopen immigration proceedings. The INS argued that the application constituted "newly discovered," and previously unavailable evidence of Johnson's alienage. The Board granted the motion and the ensuing hearing occurred before Immigration Judge Sease.

## B. THE SECOND REMOVAL HEARING

At the second hearing, the INS introduced several pieces of evidence in addition to Johnson's Social Security application. The additional evidence could have offered at the original hearing but was not. Special Agent Dane Eppley, testified about the birth certificates of Robert Cross and Hazel May Francis. He also provided a copy of an official copy of David Lloyd Johnson's birth certificate and the death certificate of Robert Cross. The latter was dated, June 21, 1989, and stated that Cross's mother's name was "Francis."

Eppley had contacted Diane Murphy, Cross's widow. She did not know how Johnson entered the United States, but knew that Johnson came from Jamaica after his

14

mother and sister died.   Murphy also confirmed that Cross  was Johnson's brother and

that Cross cared for Johnson because Johnson had no one else to take care of him.

However, Eppley never took a statement from Murphy, and she did not testify at the

hearing.[11]

Unlike the first hearing when IJ Van Wyke allowed White to testify via the

telephone because her health made it difficult for her to appear in person, Immigration

Judge Sease did not permit White to testify telephonically.  She (IJ Sease) did not believe

that health problems should prevent White from traveling to Lancaster, Pennsylvania

from Brooklyn because it was "not a difficult trip."  Instead, White's testimony was

offered in an affidavit that contained information that was substantially identical to her

testimony at the first hearing.

Johnson testified once again at the second  hearing, and he explained the

circumstances surrounding his Social Security application.  He stated that he went to the

Social Security office with someone who worked in his attorney's office, but he filled out

the application himself.  He was told to fill out each space on the application and

therefore wrote "Hazel Francis" in the space provided for the mother's name.  Johnson

---

[11] "Hearsay evidence is . . . admissible in removal proceedings. Though the hearsay
nature of evidence certainly affects the weight it is accorded, it does not prevent its
admissibility in  immigration  cases." *Kirelddeen  v. Ashcroft,* 273 F.3d 542, 548 (citing,
*Cunanan v. INS*, 856 F.2d 1373, 1374 (9th Cir. 1988);  *Martin-Mendoza v. INS*, 499 F.2d
918, 921 (9th Cir. 1974); and  *Matter of Grijalva*, 19 I. & N. 713, 721-722 (BIA 1988).

15

also testified that he was told he had to "have everything exact from the identification that you got." A.R. 141-42. Johnson was asked why he wrote "Kingston, Jamaica" on the application, rather than merely entering "Jamaica," as the I-94 stated. He explained that he listed Kingston as his place of birth because, during the first hearing "they was trying to say I was from Kingston." A.R. 143. Johnson explained further that he did not submit his birth certificate with his Social Security card application. He also explained that the staff member who accompanied him may have submitted the birth certificate with his Social Security application.

IJ Sease found that the INS had met its burden of proving alienage. She rejected Johnson's disavowal of the Social Security application because Johnson had been party to an extended hearing on the issue of alienage. Thus, the IJ reasoned, Johnson's use of the birth certificate could only be taken as an admission that it was his. IJ Sease also rejected White's recollection that Johnson was four when he came into her care because the IJ was troubled by White's "imprecise recollection of dates."[12] Instead, the IJ noted that Johnson testified that he remembered attending his sister's funeral at age four, and thereafter celebrating two birthdays before going to stay with White. Thus, the IJ concluded that Johnson was actually six when he began living with White. The IJ then

---

[12] The IJ was referring to White's assertion that Johnson came into her care in 1987. In fact, Johnson actually came into White's care sometime in 1989, as that was the year Robert Cross's death certificate established for Cross's death.

16

weighed the evidence from the first hearing and the newly presented evidence, and concluded the INS had proven its case by "clear and convincing evidence." Accordingly, the IJ ordered that Johnson be removed to Jamaica.

The BIA summarily affirmed that ruling, and Johnson filed this petition for review to challenge the order granting the government's Motion to Reopen. In petitioning for review, Johnson added a claim that he was actually a U.S. citizen. We transferred that nationality claim to the District Court so that Johnson could properly assert it in an action for a declaratory judgement.

As we noted at the outset, the District Court eventually entered judgement against Johnson pursuant to a stipulation he entered into with the government. Johnson then appealed that ruling to this court, and we consolidated that nationality claim with the petition for review of the BIA's order granting the Motion to Reopen.[13]

### III. DISCUSSION

#### A. Adequacy of Service of the Motion to Reopen.

---

[13] The court ruled that Johnson had the burden of proving that he is a U.S. citizen, and that the INS did not have to prove that he was a citizen of Jamaica. Johnson then stipulated that he could not establish his citizenship. He acknowledged that the court would therefore enter judgment against him, and that his appeal from the denial of the nationality claim should be transferred back to this court for consolidation with his petition for review of the second IJ's ruling in the removal proceedings. However, in entering that stipulation, he reserved his right to appeal the District Court's allotment of the burden of proof.

Johnson first contends that the government failed to properly serve the Motion to Reopen and that, as a result, the BIA could not have properly considered that motion. He claims that "[t]he [g]overnment never provided evidence that it properly served the Petitioner or counsel with the Motion to Reopen." Appellant's Br. at 27. The argument is meritless.

The government filed the Motion to Reopen on March 6, 2002, along with a Certificate of Service certifying that the motion had been sent via first-class mail to Johnson's counsel of record. Johnson's counsel denied receiving the motion. However, when he learned it had been filed, he requested that a copy be faxed to him, and the government complied with that request. In Johnson's Reply, he argued, *inter alia*, that the motion should be dismissed for failure of service. The BIA concluded that the Certificate of Service was sufficient proof of service, and rejected Johnson's argument.

8 CFR § 1003.2(g) governs service of process for motions to reopen. It provides in pertinent part: "[i]n all cases, the motion [to reopen] shall include proof of service on the opposing party of the motion and all attachments." The regulations do not specify what constitutes adequate proof of service. The BIA concluded that proof of mailing satisfied the requirements for service under that regulation. We agree.

"An agency's interpretation of its own regulation is controlling unless it is plainly erroneous or inconsistent with the regulation." *Moi Chong v. Dist. Dir. INS*, 264 F.3d 378, 389 (3d Cir. 2001) (internal citation omitted). Here, it is uncontested that a copy of

18

the Motion to Reopen was properly mailed to Johnson's counsel at the address stated on his entry of appearance.

Johnson does not allege a constitutional violation resulted from inadequate notice or opportunity to respond to the government's motion, nor could he. In Johnson's Reply to that motion, counsel confirms that he received the motion in advance of the Board's ruling. Counsel states: "Counsel for Respondent finally received a faxed copy of the Motion on April 23, 2002 after he telephoned indicating he had not received a copy. INS Counsel faxed the Motion and indicated that Respondent's counsel could obtain a copy of the exhibit, a Social Security card application, from the INS office in Philadelphia where the main file is." Reply at ¶ 2. There is no suggestion that counsel could not properly respond to the government's motion because of the delay, and nothing suggests that any delay that may have resulted was anything other than inadvertent and harmless. Moreover, Johnson does not allege that he was prejudiced in any way because he had to await receipt of a copy that was faxed to him.

**B. Materiality of the Evidence Presented by the Motion to Reopen.**

Johnson also argues that the BIA erred in reopening the removal hearing because the evidence that was to be presented was not "material," as required by the applicable

19

regulation.[14] The government relies on § 242 (a)(2)(C) of the Immigration and Nationalities Act to argue that we have no jurisdiction to review this argument.

We clearly have jurisdiction to determine our own jurisdiction under 8 U.S.C. § 1252(a)(2)(C). *See, e.g. Drakes v. Zimski*, 240 F.3d 246, 247 (3d Cir. 2001). Prior to the Real ID Act, § 1252(a)(2)(C) limited our jurisdiction to review orders of removal. That section provided: "no court shall have jurisdiction to review any final order of removal against an alien who is removable by reason of having committed a criminal offense covered in section 212(a)(2)."[15] However, in enacting the REAL ID Act, Congress expanded our jurisdiction to include constitutional claims and questions of law even when

---

[14]Johnson also argues that the evidence used to reopen proceedings against him was "manufactured" by the government. He contends that he was entitled to an I-94 Form listing his place of birth as "unknown," after IJ Van Wyke terminated the removal proceedings and ruled that the government had not established Johnson's alienage. Johnson claims that the government therefore obtained the new evidence (the Social Security application) as a direct result of its own wrongful actions. The argument is not without some force, however, we need not address it because we find the newly discovered evidence was not material as required by 8 CFR § 1003.2.

       Johnson also contends that the Social Security application was not "previously unavailable" because it was created on April 5, 2001, and was thus available when the government filed its petition for review of IJ Van Wyke's order in October of 2001. Johnson is wrong. New evidence can not be presented to the Board during an appeal. 8 CFR § 1003.1(d)(3)(iv). Thus, the Social Security application was "newly discovered" within the meaning of § 1003.2 because it was "not available and could not have been discovered or presented at the former hearing." "[F]ormer hearing" plainly refers to the proceedings before the Immigration Judge, not the BIA.

[15] Johnson was convicted of a Conspiracy to Commit Possession of a Controlled Substance (cocaine) in violation of 8 U.S.C. § 1182(a)(2)(A)(i)(II), an offense covered in § 212(a)(2).

20

those issues arise in the context of hearings to remove an alien based on a controlled substance conviction. *See* Real ID Act § 106(a)(1)(A)(iii), codified at 8 U.S.C. § 1252(a)(2)(D).

Motions to reopen are governed by 8 CFR § 1003.2(c)(1), which provides that "[a] motion to reopen proceedings *shall not be granted unless* it appears to the Board *that evidence sought to be offered is material* and was not available and could not have been discovered or presented at the former hearing." (Emphasis added). Accordingly, the BIA is required to deny a motion to reopen in the absence of material new evidence.

The government argues, however, that the materiality of evidence presented with a motion to reopen is a factual determination and therefore outside the scope of our jurisdiction. That position ignores the nature of materiality and misconstrues the order under review. Materiality is a mixed question of law and fact. *See. e.g.*, *United States v. Gaudin*, 515 U.S. 506, 512 (1995); *FL Advantage Fund, Ltd. v. Colkitt*, 272 F.3d 189, 213 (3d Cir. 2001). We ordinarily review mixed questions of law and fact "under a mixed standard, affording a clearly erroneous standard to integral facts, but exercising plenary review of the . . . interpretation and application of those facts to legal precepts." *Schlumberger Res. Mgmt. Servs. v. CellNet Data Sys.*, 327 F.3d 242, 244 (3d Cir. 2003). Thus, although we lack jurisdiction to review the Board's factual determinations, we retain the jurisdiction to review the Board's application of those facts to legal principles.

21

Moreover, the government's jurisdictional argument under the REAL ID Act ignores the issue framed by Johnson's Petition for Review. Johnson is not challenging "a final order of removal" under 8 U.S.C. § 1252(a)(2)(D). Rather, he is challenging the Board's order granting the government's motion to reopen. "There re is no statutory provision for reopening of a deportation proceeding, and the authority for such motions derives solely from regulations promulgated by the Attorney General." *INS v. Doherty*, 502 U.S. 314, 322. The controlling regulation, "requires that under certain circumstances a motion to reopen be denied, . . .". *Doherty,* 502 U.S. at 322.

The Supreme Court has never determined the applicable standard of review for removal hearings that involve disputed alienage claims. However, the Court has ruled that rulings on motions to reopen cases involving asylum and withholding of removal are to be reviewed for abuse of discretion. *INS v. Abudu,* 495 U.S. 94, 107 (1985). In *Abudu*, the Court explained:

> The Agency's regulation that provides for reopening of deportation proceedings, 8 CFR § 3.2 (1987),[16] applies to all motions to reopen, regardless of the underlying substantive basis of the alien's claim. Further, the separate Agency regulation relied on by the BIA in denying respondent's motion to reopen, 8 CFR § 208.11 (1987), addresses not the underlying substantive standard for an asylum claim, but rather the additional threshold an alien must overcome on a motion to reopen to make such a claim. As we are simply defining the standard a Court of Appeals must

---

[16] 8 CFR § 3(2) is now 8 CFR § 1003(2)

apply in reviewing the BIA's denial of reopening on §§ 3.2
and 208.11 grounds . . ..

Although the underlying claim here turns on alienage rather than persecution, we think it clear that we still review for an abuse of discretion. "The agency's regulation applies to all motions to reopen, regardless of the underlying substantive basis for the alien's claim." *Id.*.

We have explained that, when reviewing for an abuse of discretion, we reverse the BIA's decision only "if it is arbitrary, irrational, or contrary to law." *Sevoian v. Ashcroft*, 290 F.3d 166, 174 (3d Cir. 2002). Pursuant to 8 CFR § 1003(2), the Board's authority to reopen is limited to situations where it is necessary to reopen removal proceedings to consider newly discovered, material evidence that was "not available and could not have been discovered or presented at the former hearing." *Doherty*, 502 U.S. at 323, (quotations omitted); *see also* 8 CFR § 1003.2 (2003).

Given this record, we believe that the Board abused its discretion in granting the government's Motion to Reopen. As we noted earlier, IJ Van Wyke terminated removal hearings because all of the government's proof could be traced to a very suspect birth certificate. That IJ painstakingly analyzed the evidence admitted at the first removal hearing and concluded that, although the government's proof was not limited to that birth certificate, the government's evidence was nevertheless only as strong as the reliability of that document. Given the circumstances surrounding White's possession

23

of that document, the discrepancies between the document and Johnson's probable age and name, as well as other circumstances that undermined the reliability of the birth certificate, IJ Van Wyke concluded that any claim of Johnson's alienage that rested upon that document was not established by the clear and convincing proof the law required for removal. Indeed, as noted above, the IJ was skeptical that the proof even satisfied the preponderance standard. Accordingly, the IJ terminated the removal proceedings.

Despite that ruling, the very next day, the government issued an I-94 stating that Johnson was a citizen of Jamaica; an error that it repeated weeks later when Johnson tried to correct it by requesting a new I-94 listing his citizenship as "unknown," as determined by IJ Van Wyke.

The BIA affirmed IJ Van Wyke's ruling in a thoughtful opinion in which the evidence of Johnson's alienage was again considered and once again found wanting because it rested on the questionable birth certificate:

> [w]e find that the Service has not established by clear and convincing evidence that the birth certificate relates to the respondent and reflects the facts of his birth. As the Form I-213 is based on the birth record, we find that it also is insufficient to establish the Service's case.

A.R. 368. Even though the government had twice been told that the birth certificate and evidence derived from it did not establish Johnson's alienage, it subsequently filed a Motion to Reopen with the Board based solely on newly discovered evidence that was

24

even more tightly tethered to the discredited birth record than the I-213 that the Board had already rejected.

In its Motion to Reopen, the government averred: "a copy of the respondent's application for a Social Security card, dated April 15, 2001. . . lists his place of birth as Kingston, Jamaica." A.R. 337. That Social Security application thus became the fulcrum that was used to pry open the closed removal proceedings so that the government could once again attempt to leverage the birth certificate into a removal order.

Although the government introduced evidence at the ensuing removal hearing that was not introduced at the first hearing, the Board's decision to reopen rested solely upon the purported "admission" contained in the application for a Social Security card. In granting the motion, the Board held that the purported admission of application was "material to . . . whether the respondent is an alien." *Id*. Given all that had gone before, that "admission" was no more material than the I-94, the I-213 or the birth certificate itself. Accordingly, the Board abused its discretion in granting the Motion to Reopen based upon materiality of the newly discovered evidence.

The government argues that materiality is "a very low threshold" and that evidence need only have some connection to consequential facts to be material. Appellee's Br. at 31. However, there is no universally applicable standard of materiality. *United States v. Puerta*, 982 F.2d 1297, 1305 (9 th Cir. 1992). *Puerta*,

25

involved a denaturalization proceeding. In that context, the court observed:

"[w]hatever attractions a unitary approach to materiality may have, its application to the immigration laws has failed to win an endorsement from a majority of the Supreme Court."

Given the circumstances here, materiality must have a higher threshold than the government claims. Section 1003.2(c)(1) "is framed negatively." *See Immigration & Naturalization Service v. Jong Ha Wang*, 450 U.S. 139, 143 (1981). Accordingly, the BIA does not have the authority to grant a motion to reopen unless the evidence that is put forward as newly discovered is material. *See* 8 CFR § 1003.2(c)(1).

The Supreme Court has likened motions to reopen deportation proceedings to petitions for rehearing or motions for new trials, which are only granted "in the most extraordinary circumstances" and "are viewed with great caution." *Abudu*, 485 U.S. at 107-109. While *Abudu* concerned an alien who sought to reopen, and the Court was concerned that granting motions to reopen too freely would "permit endless delay of deportation by aliens creative and fertile enough to continuously produce new and material facts," the Court was also troubled that it would "waste the time and efforts of immigration judges called upon to preside at hearings." *Id* at 107 - 08.[17] This is true

---

[17] Such concerns are typically expressed in relation to motions to reopen filed by aliens. *Abudu* and *Doherty* are examples of this, and we are not prepared to conclude that identical concerns attach to motions to reopen filed by aliens, However, concerns of finality, fairness, and the public's confidence in the objectivity in an agency's

irrespective of which party moves to reopen.

Motions to reopen are "plainly disfavor[ed]," because "[t]here is a strong public interest in bringing litigation to a close as promptly as is consistent with the interest in giving the adversaries a fair opportunity to develop and present their respective cases." *Id*. at 108.

The party seeking to reopen proceedings usually carries a "heavy burden." *Id*. at 110. The evidence presented on a motion to reopen must be sufficiently material to establish "that if proceedings before the [IJ] were reopened, with all attendant delays, the new evidence offered would likely change the result in the case." *In re Coelho*, 20 I. & N. Dec. 464, 73 (BIA 1992). Thus, materiality must not be evaluated in a vacuum. Instead, it must be assessed in the context of the proceeding that is to be reopened, and the claim that is to be proven. Here, the newly discovered evidence was merely another manifestation of the previously scrutinized birth certificate. It did not materially differ from the I-213, the I-94 or Johnson's school records. The only difference was that Johnson added that he was born in Kingston on the Social Security application. However, that is a difference without a distinction. Johnson explained that he added the city of his birth because that was the city that was repeatedly mentioned as his place of

---

adjudication can not be ignored merely because the motion is filed by the alien rather than the government.

27

birth during immigration proceedings, and he was told that all the information on the Social Security application had to be filled in and consistent with his official documents. Given all that had gone before and the findings of IJ Van Wyke, the addition of Kingston was understandable and immaterial.

When testifying before IJ Van Wyke, Johnson repeatedly explained his use of the information on the disputed birth certificate. He uses the name "David Johnson," because that was the name Ethel White registered him under when she first enrolled him in school. Until then, he had been known as "Troy Jenkins," and that is what people called him. IJ Van Wyke accorded Johnson's consistent adoption of the information from the repudiated birth certificate little weight. *See* A.R. 436. As noted above, IJ Van Wyke concluded that the evidence linking Johnson to the certificate "may not even come to a preponderance." *Id*. Accordingly, an additional instance of Johnson using information from the birth certificate and the erroneously issued I-94 could hardly transform the quality or reliability of the information on the birth certificate. It bears repeating that the I-94 was based solely on the birth certificate, and it is not at all clear how or why the I-94 issued listing Johnson's citizenship as "Jamaica" rather than "unknown."

Materiality of the Social Security card application must encompass the circumstances in which it was filled out. Form I-9, the federal Employer Eligibility Verification form, provides that "[a]ll employees, citizens and noncitizens, hired after

28

November 6, 1986, must complete Section 1 of this form at the time of hire." Form I-9, p.2 (Rev. 05/31/05). It further provides that employers "must complete Section 2 by examining evidence of identity and employment eligibility." *Id.* Identity and employment eligibility must be proven by presenting one or more documents listed on the form. An examination of the "list of acceptable documents" makes it clear that Johnson could not have applied for work without a Social Security card.[18] Obtaining a Social Security card, in turn, required Johnson to present both his I-94 and his birth certificate. *See* Form SS-5, p.1 ("To apply for an **original card**, you will need **at least two** documents to prove **age, identity**, and **U.S. citizenship or current, lawful, work-authorized immigration status**") (emphasis in original). Thus, in order to obtain employment, it was necessary for Johnson to use the only documents he had - the birth certificate and the I-94. Clearly, the information on the Social Security card application had to match those documents. That meant that Johnson had no choice but to list Jamaica as his place of birth or remain unemployed.

Moreover, there is a rather perplexing and troubling irony here. The continuation of this saga is due in no small measure to the fact that the government issued an I-94 to

---

[18] Johnson had no legal right to receive any of the other documents on the acceptable documents list based on the paperwork available to him. The only document, other than a Social Security card, listed on the I-9 that Johnson may have been eligible for at the time, an I-688, also requires an admission of alienage. Alternatively, Johnson could have waited for the outcome of his declaratory proceeding where he sought to be declared a U.S. citizen. Johnson did not prevail in that proceeding. Thus, he would have ended up in the same situation years later.

Johnson declaring him to be a citizen of Jamaica even though IJ Van Wyke had just ruled that the government had failed to prove that Johnson was Jamaican. When Johnson attempted to correct that error, the INS issued a second I-94 that once again declared him to be a citizen of Jamaica. Although Johnson claims this was an intentional act to circumvent the Immigration Judge's ruling, the record surrounding the issuance of the I-94 is less than sparse.

In the brief it filed in this court, the government takes umbrage at Johnson's suggestion that the I-94s were issued as part of a deliberate effort to declare Johnson's alienage despite the IJ's ruling. The government responds: "The suggestion that the evidence was 'manufactured' is not well-taken. While Johnson would argue that INS issued the I-94 in 'contravention' of the immigration judge's decision, it bears mentioning that once INS took an appeal of the immigration judge's decision, the decision became non-final and not binding on INS. *See* 8 CFR § 1003.39." Appellee's Br. at 31 n.4.

Although this record does not support Johnson's suggestion of an improper motive or the government's response, we note that the rejoinder in the government's brief is less than convincing. The INS claims that the IJ's ruling was not binding once it took an appeal and suggests that it could therefore issue an I-94 stating Johnson was Jamaican even though that had not been established. However, as noted above, the first I-94 was issued on March 13, 2001, the day after the IJ ruled and either the day Johnson

was released from custody, or the day after. The second I-94 was issued on April 4, 2001, approximately three weeks later. According to the BIA, the INS did not file its appeal of the IJ's ruling until "[o]n or about September 1, 2001[.]" *See* A.R. 358. Moreover, it is difficult to understand why the INS would agree to issue a second I-94 before the expiration date of the first. That difficulty is compounded by the fact that the second I-94 bears the same expiration date as the first one and was therefore not intended as an extension of Johnson's status. Rather, the I-94s are consistent with Johnson's claim that he requested the second form to correct the erroneous citizenship information on the first one.

Whatever the reason for the inaccurate citizenship information on the two I-94s, it was not because the IJ's ruling had become a nullity as the INS now claims. After those forms were issued, they took on a life of their own and played no small role in the ultimate fate of the young man now known as "David Johnson."

Nothing in the above discussion should be construed as condoning or excusing Johnson's use of potentially false information to obtain employment documents. However, our task is not to examine the propriety of his actions. Rather, we must determine whether, "if proceedings before the [IJ] were reopened, with all attendant delays, the new evidence offered would likely change the result in the case." Given the Catch 22 Johnson was caught in, and the questions surrounding the birth certificate, nothing indicates that the Social Security application would have altered IJ Van Wyke's

31

decision.

Thus, we conclude that the Board abused its discretion in granting the INS's Motion to Reopen.

## IV. NATIONALITY CLAIM

As we noted above, in petitioning for review of the Board's affirmance of the ruling of the second IJ, Johnson also asked this court to conclude that he was actually a United States Citizen and therefore not subject to removal, and we transferred that matter to the Eastern District of Pennsylvania pursuant to 8 U.S.C. § 1252(b)(5)(B).[19] In the District Court, Johnson based his declaratory judgement action on 8 U.S.C. § 1401(f), the "foundling" statute. Section 1401(f) provides that "a person of unknown parentage found in the United States while under the age of five years, until shown, prior to his attaining the age of twenty-one years, not to have been born in the United States," shall be a "national[] and citizen[] of the United States at birth."

In the District Court, Johnson conceded that he bore the burden of proving the first two requirements under the statute - (i) that he is of "unknown parentage;" and (ii) that he was discovered before the age of five in the United States. Johnson contends,

---

[19] 8 U.S.C. 1252(b)(5)(B) provides that "[i]f the petitioner claims to be a national of the United States and the court of appeals finds that a genuine issue of material fact about the petitioner's nationality is presented, the court shall transfer the proceeding to the district court of the United States for the judicial district in which the petitioner resides for a new hearing on the nationality claim and a decision on that claim as if an action had been brought in the district court under section 2201 of title 28, United States Code.

32

however, that § 1401(f) creates a presumption in favor of the foundling, and thus the initial burden of proving alienage is shifted to the United States.

Johnson's approach to the burden of proof is somewhat puzzling. Although conceding he has the burden of proving the first two elements, he appears to rely on a presumption that would establish those facts unless the government produced sufficient evidence to rebut the presumption. He argues that a foundling could not be required to prove unknown parentage or age because he/she does not have first-hand knowledge of this information. Although we agree that it is exceedingly difficult for an alien to prove his/her citizenship under the foundling statute, Johnson nevertheless stipulated that he had the burden that he now tries to shift to the government.

The District Court acknowledged the potential evidentiary problems created for a foundling who is required to prove the elements of § 1401(f). However, the court determined that Johnson nonetheless bore the initial burden of establishing his nationality claim by preponderance of the evidence. The court based its reasoning on the clear language of 8 U.S.C. §§ 1401(f) and 1252(b)(5)(B) and 28 U.S.C. §2201. The latter places the burden of proof on the party seeking declaratory relief of citizenship status, *see, e.g.*, *Delmore v. Brownwell*, 236 F.2d 598, 600 (3d Cir. 1956).

Following the court's ruling on the burden of proof, the parties entered into a stipulation that judgement would be entered against Johnson, but he reserved his right to appeal the court's allocation of the burden of proof. He now claims that "[t]he

33

Government cannot show with clear and convincing evidence that [he] is not a citizen according to 8 U.S.C. § 1401(f)." Appellant's Br. at 53.

Johnson's argument is belied by the stipulation he entered into. It appears that his claim that he is entitled to a presumption to establish the first two elements is based upon his reading of *Delmore*. There, however, the plaintiff introduced a letter his counsel had obtained from the Commissioner of Immigration in response to a request that Delmore's citizenship be clarified. The Commissioner's letter stated in part: "it appeared that Delmore was born in San Francisco as he claimed 'and that . . . it is the view of this Service . . ., that Mr. Delmore may properly be regarded a national and citizen of the United States.'" 236 F.2d at 600 (first ellipsis in original). In affirming the District Court's grant of declaratory relief to Delmore, we merely concluded that: "Once the United States has determined that an individual is a citizen, it should be required to disprove its own determination by clear, unequivocal, and convincing evidence . . .." *Id*. In effect, the Commissioner's letter created an estoppel and became determinative unless the government could rebut it. As the District Court properly noted, we stated: "[p]laintiff had the burden of proving his citizenship by a preponderance of the evidence. The letter established his prima facie case. . . . when plaintiff seeking a declaration of citizenship, . . . has made out a prima facie case, it is necessary for the government, in order to rebut it, to do so by clear, unequivocal, and convincing evidence." *Id*. (citations omitted).

34

Here, the District Court noted that Johnson conceded that he had the burden of establishing the first two elements by a preponderance of the evidence, and that this created a presumption of citizenship that would control unless rebutted by the government by clear and unequivocal evidence. Johnson now objects to the District Court's application of that evidentiary framework. However, the District Court's decision was perfectly consistent with our decision in *Delmore* as well as Johnson's stipulation. We have reviewed the District Court's resolution of Johnson's § 1401(f) claim and the court's reliance on *Delmore*, and we will affirm the order of that court substantially for the reasons set forth in District Court's June 2, 2005 opinion.