*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 11a0176p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

UYI DUGBOE,

*Petitioner,*

*v.*

No. 10-3010

ERIC H. HOLDER, JR., Attorney General,

*Respondent.*

On Petition for Review from
the Board of Immigration Appeals.
No. A074 547 484.

Decided and Filed: July 6, 2011

Before: COLE, CLAY, and GILMAN, Circuit Judges.

_____

**COUNSEL**

**ON BRIEF:** Matthew L. Benson, BARTLETT & WEIGLE CO., L.P.A., Cincinnati, Ohio, for Petitioner. Michael C. Heyse, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent.

_____

**OPINION**

_____

RONALD LEE GILMAN, Circuit Judge. Uyi Dugboe faces removal to Nigeria, his home country. He challenges the decisions of the Immigration Judge (IJ) and the Board of Immigration Appeals (BIA) to deny him withholding of removal under both the Immigration and Nationality Act (INA) and the United Nation's Convention Against Torture (CAT). He also contests the denial of his motion to remand (which would have allowed him to seek the adjustment of his status based on his marriage to a U.S. citizen) and the denial of his motion to transfer the venue of his removal proceedings from

Detroit to his hometown of Chicago. For the reasons set forth below, we **DENY** Dugboe's petition for review.

## I. BACKGROUND

Dugboe is a native and citizen of Nigeria who entered the United States illegally in 1992. He married a U.S. citizen in 1995, and the couple has a daughter who was born in 1996. In the same year that his daughter was born, Dugboe applied to adjust his status to that of a lawful permanent resident.

On May 11, 1997, Dugboe attempted to enter Canada near Port Huron, Michigan by falsely claiming to be Frank Nelson, Jr., a U.S. citizen, and by presenting documents purporting to be Nelson's birth certificate, Illinois driver's license, and Illinois identification card. Canadian authorities refused him entry and escorted him back to U.S. immigration officials at Port Huron. Immigration Supervisor Fochtman and Senior Immigration Inspector Cozza questioned Dugboe, who repeated his claim that he was Nelson and that he was a U.S. citizen.

Several discrepancies, however, strongly suggested to these officials that Dugboe was not who he claimed to be. Dugboe, for example, could not correctly name the parents on Nelson's birth certificate, i.e., Dugboe's alleged parents. He also incorrectly identified where his alleged parents were born. Although Dugboe further claimed that he had no prior convictions, an FBI database search revealed a 15-page criminal record for Nelson. Dugboe denied the crimes at first, but then admitted to committing some of them. Yet Dugboe's fingerprints did not match those on file for Nelson.

Inspector Cozza searched Dugboe's belongings and found an Amtrak ticket issued in Dugboe's name, which Dugboe denied was his. When Cozza ran the name Dugboe through the United States Customs and Immigration Service's database, he learned that Dugboe was a known alien. Cozza then advised Dugboe of the consequences of falsely claiming U.S. citizenship, but Dugboe continued to insist that he was a U.S. citizen. After being detained for several hours while immigration officials attempted to obtain his picture from immigration records, Dugboe finally admitted in a

sworn statement that his real name was Dugboe, that he was a native and citizen of Nigeria, that he entered the United States in 1992 without being inspected, that he had purchased the birth certificate and Social Security card of Nelson for $100, that he had falsely claimed to immigration officials at Port Huron that he was a U.S. citizen, and that he knew that falsely claiming U.S. citizenship was illegal.

A search of the FBI database using Dugboe's name revealed several theft arrests in Atlanta under the name Osa Michael, a black male using the name Dugboe as an alias. Dugboe denied both having been arrested in Atlanta and having used the name Michael. But Dugboe's fingerprints matched those for Michael on file with the FBI.

In May 1997, the Immigration and Naturalization Service (INS) personally served Dugboe with a Notice to Appear (NTA), charging him with being removable as an alien who (1) "entered at a time/place/manner other than as designated by the Attorney General," in violation of 8 U.S.C. § 1182(a)(6)(A)(i), and (2) falsely claimed to be a U.S. citizen in order to conceal his identity, nationality, and immigration status, in violation of 8 U.S.C. § 1182(a)(6)(C)(ii). Dugboe was served with another NTA by mail in October 1998 that contained additional allegations, including the charge that Dugboe falsely claimed to be a U.S. citizen "for the purpose of remaining in the United States." This NTA was filed with the immigration court in Detroit. (The enforcement functions of the INS have since been transferred to the Department of Homeland Security by § 441 of the Homeland Security Act of 2002, Pub. L. No. 107-296, 116 Stat. 2135. For simplicity, we will continue to use the term INS.)

In February 1999, Dugboe alternatively moved to terminate his proceedings, to allow a telephonic hearing, or to change the venue to his hometown of Chicago. He noted, among other things, that the Chicago immigration office had jurisdiction over his pending application to adjust his status, and that appearing at a hearing in Detroit would be a great hardship due to the travel required. The INS opposed the motion for three primary reasons: (1) Dugboe is ineligible to adjust his status because the INA deems him "inadmissible" due to his false claim of U.S. citizenship; (2) Dugboe attempted to enter, and was apprehended in, the Detroit area; and (3) Dugboe had not conceded the charges

against him, which would require the INS to call Port Huron immigration officials to prove the charges against Dugboe. All of Dugboe's motions were denied for the reasons given by the INS.

Dugboe appeared before the immigration court in Detroit in May 1999, where he denied all of the factual allegations and removability charges, indicated his intention to seek asylum and withholding of removal under the INA and the CAT, and renewed his motions to terminate the proceedings or change the venue to Chicago. The IJ offered to transfer the venue to Chicago if Dugboe would admit that he falsely claimed to be a U.S. citizen, but Dugboe declined. Dugboe countered by suggesting that any government witnesses could testify by telephone, an offer that the IJ rejected.

In August 1999, Dugboe again appeared before the immigration court in Detroit and filed his application for asylum and withholding of removal (asylum application). The IJ denied the asylum application because it was not timely filed. Dugboe then orally renewed his venue-transfer motion, but the IJ declined to consider the issue absent a written motion.

The immigration court held a merits hearing in October 2003 on Dugboe's removal proceedings. Inspector Cozza was called by the INS to discuss Dugboe's attempt to reenter the United States on May 11, 1997 by falsely claiming to be a U.S. citizen. Cozza's testimony was consistent with the facts recounted above about those events. Of particular note, Cozza explained that the interview transcript of Dugboe's sworn statement contained Dugboe's initials after each question and answer, which indicated that Dugboe agreed with the answers given.

Dugboe testified next. He initially claimed to never have used another name or alias, but then refused to answer whether he had ever used the name Frank Nelson, Jr. The IJ informed Dugboe that although he could refuse to answer a question, the IJ could draw an adverse inference against him based on that refusal. Dugboe still refused to answer whether he attempted on May 11, 1997 to enter Canada from Port Huron using Nelson's name and documents. Although Dugboe claimed that he could not remember when he spoke to U.S. immigration officials at Port Huron, he did not deny that he had

spoken to them. Dugboe later refused to answer whether he remembered being interviewed by an immigration official. Simultaneously, he claimed that he could not remember anything about the interview, including the answers that had his initials next to them. When he was shown his signature at the bottom of the sworn statement, he did not deny that it was his signature, but instead claimed that he did not remember signing the document.

Dugboe further claimed that he could not remember whether he bought Nelson's birth certificate, but later changed his answer to a refusal to respond. Nor could he recall being issued an Illinois driver's license in the name of Frank Nelson, Jr., although he later admitted that his photo appeared on an Illinois license issued to Nelson. Dugboe did not remember ever possessing this license. Similarly, he admitted that his photo appeared on an Illinois identification card in Nelson's name, but he did not remember applying for the card.

Dugboe's testimony was also inconsistent with his asylum application and other filed documents. He denied ever leaving the United States, even though his asylum application indicated that he last left the United States in 1997 to visit his father, who was ill in Nigeria. Dugboe then refused to answer whether his asylum application was wrong, but still claimed that he had never left the United States.

The IJ found that all of the facts and charges alleged by the government had been demonstrated by clear and convincing evidence. Accordingly, the IJ found that Dugboe was removable. The IJ then turned to Dugboe's applications for relief. Because Dugboe had testified contrary to several statements in his asylum application, the IJ gave Dugboe time to review and amend the application before signing it under oath. Dugboe reviewed the application with his attorney for 28 minutes, made some changes, and then signed it.

Concerning the merits of his claims for relief, Dugboe testified that he left Nigeria in 1992 because he and his family are Christians, that there were problems between Christians and Muslims, and that one of his brothers, who he initially called Harry, became involved in these problems. Harry allegedly took part in a Christian

demonstration in northern Nigeria about three months before Dugboe left the country in 1992. But when Dugboe was asked to discuss this incident in more detail, he did not describe a demonstration; he instead recounted that his brother was burned and beaten by Muslims inside a church. His testimony about this event had very few specific details. Based on the sequence of questions and answers, Harry was the brother who was purportedly burned, although Harry's name was never used specifically by Dugboe in describing the burning incident.

When Dugboe was later asked about the brother mentioned in his asylum application, he said that that was his brother Dourbo, not Harry. He testified that his brother Dourbo was the one who was beaten and arrested for participating in the demonstration. Dugboe implied that this incident contributed to his decision to leave, but when the IJ questioned him about the incident in more detail, Dugboe claimed that the demonstration occurred in the 1980s rather than three months before he left Nigeria in 1992. And even though Dugboe's application stated that his brother was arrested and "held for approximately one and a half months [in] prison [conditions that] were terrible," Dugboe testified that he did not know how long his brother was incarcerated.

Dugboe said that he feared returning to the northern part of Nigeria, which is predominantly Muslim, because he was Christian. He admitted that the southern part of Nigeria is predominantly Christian, but claimed that he could not live there because his parents live in the north. Despite testifying that he has had contact with his family in Nigeria since coming to the United States, he did not submit any affidavits from them.

Dugboe also asserted that his wife and daughter, who are Christian like him, would be killed if they returned with him to Nigeria. At first he testified that they likely would *not* return to Nigeria, but later said that he did not know this for sure.

Dugboe's wife Edlyn testified on his behalf as the final witness. She said that she is a Christian and that she feared living in Nigeria because she believed that her daughter would be forced to undergo female genital mutilation (FGM). Despite her fears, Edlyn said that if Dugboe was removed to Nigeria, then the entire family would go with him.

At the end of the hearing, the IJ found Dugboe removable as charged and denied all of Dugboe's grounds for relief. The IJ found that Inspector Cozza was credible, but that Dugboe and his wife were not. More specifically, the IJ noted that Dugboe refused to answer a number of questions, doubted Dugboe's claims that he could not remember certain facts, and concluded that Dugboe had lied about others.

Turning to Dugboe's claims for withholding of removal under the INA and the CAT, the IJ determined that Dugboe's fears that he would be persecuted if returned to Nigeria were "unsubstantiated guesses." The IJ noted that country-condition reports by the U.S. State Department did not support the conclusion that Dugboe would likely suffer religious persecution. Those reports also showed that the Nigerian government opposes FGM, that a number of regions have banned the practice—including the region where Dugboe spent most of his life in Nigeria—and that the number of women undergoing FGM has declined each year. Moreover, if a father opposes FGM for his daughter, then it will not occur. The IJ further observed that since Dugboe was unsure whether his daughter would even come to Nigeria if he was removed, he had not met the more-likely-than-not standard of showing that she would be forced to undergo FGM. For all of these reasons, the IJ found that Dugboe had not demonstrated that he would be persecuted or tortured if returned to Nigeria. The IJ therefore denied Dugboe's claims for relief.

Dugboe appealed the IJ's decision to the BIA, which adopted the IJ's decision in March 2005. After Dugboe petitioned this court for review, the Attorney General moved to remand the case to the BIA so that it could clarify why it concluded that Dugboe was ineligible to adjust his status. This court granted the government's motion and remanded the case to the BIA in December 2005. On remand, the BIA clarified its prior decision by offering the following two independent grounds for concluding that Dugboe was not eligible to adjust his status: (1) that Dugboe is an arriving alien in removal proceedings and therefore ineligible to adjust his status, and (2) that Dugboe cannot adjust his status because his false claim of U.S. citizenship renders him

inadmissible, which in turn makes him ineligible to adjust his status. The exact words of the BIA are as follows:

> In our March 11, 2005, decision we stated "adjustment is not available to the respondent in the current proceedings." The respondent is an arriving alien in removal proceedings and, therefore, is not eligible to adjust his status in removal proceedings. *While this is the basis for our previous decision, we also note that an alien who makes a false claim to United States citizenship is inadmissible under section 212(a)(6)(C)(ii) of the Immigration and Nationality Act, 8 U.S.C. 1182(a)(6)(C)(ii), and is not eligible to adjust his status.* In accordance with the order of the Sixth Circuit, our previous order is clarified.

(Emphasis added, brackets and citations omitted.)

Dugboe then filed this timely petition for review, arguing that (1) the IJ abused his discretion in denying Dugboe's motion to remand so that Dugboe could seek to adjust his status, (2) the IJ abused his discretion in denying Dugboe's motion to transfer the venue of the removal proceedings from Detroit to Dugboe's hometown of Chicago, and (3) substantial evidence does not support the IJ's decision to deny him withholding of removal under both the INA and the CAT.

## II. JURISDICTION

Our sister circuits have split over whether they have jurisdiction to decide if an IJ's denial of a venue-transfer motion was an abuse of discretion. The Eleventh Circuit has decided that it has jurisdiction to decide this issue. *Frech v. U.S. Att'y Gen.*, 491 F.3d 1277, 1282 n.9 (11th Cir. 2007). On the other hand, the Tenth Circuit has held that 8 U.S.C. § 1252(a)(2)(B)(ii) prohibits appellate review. *Ballesteros v. Ashcroft*, 452 F.3d 1153, 1159-60 (10th Cir. 2006). This statute strips circuit courts of "jurisdiction to review any action of the Attorney General 'the authority for which is *specified under this subchapter* to be in the discretion of the Attorney General.'" *Kucana v. Holder*, 130 S. Ct. 827, 831 (2010) (emphasis in original) (quoting 8 U.S.C. § 1252(a)(2)(B)(ii)). In *Ballesteros*, the Tenth Circuit held that it lacked jurisdiction to review an IJ's denial of a venue-transfer motion because the regulation governing venue-transfer decisions

granted "complete discretion" to the IJ.  *Ballesteros*, 452 F.3d at 1159 (citing 8 C.F.R. § 1003.20(b)).

But the Supreme Court's recent decision in *Kucana* undermines the Tenth Circuit's holding because the Court held "that the key words 'specified under this subchapter' refer to statutory, but not to regulatory, specifications." *Kucana*, 130 S. Ct. at 831.  An IJ's venue determination is specified as discretionary by regulation, not by the INA.  *See* 8 C.F.R. § 1003.20(b).  Although *Kucana* concerned an IJ's denial of a motion to reopen proceedings rather than a motion to transfer venue, the decision is on point because it turned on whether the jurisdiction-stripping provisions of § 1252(a)(2)(B)(ii) deprived the courts of jurisdiction to review Attorney General decisions made discretionary solely by regulation.  *See Kucana*, 130 S. Ct. at 831, 834-37.

The Supreme Court held that under § 1252(a)(2)(B)(i)-(ii), "Congress barred court review of discretionary decisions only when Congress itself set out the Attorney General's discretionary authority in the statute."  *Id.* at 836-37.  This conclusion is supported by the "presumption favoring interpretations of statutes to allow judicial review of administrative action."  *Id.* at 839 (internal quotation marks and brackets omitted).  The Court also relied on the fact that administrative decisions made discretionary by statute are "substantive decisions . . . that involve whether aliens can stay in the country or not," while decisions made discretionary by regulation are "adjunct rulings" that involve procedural issues.  *Id.* at 837 (internal quotation marks omitted).  This distinction applies to the present case because a venue-transfer decision is an adjunct ruling that involves only a procedural issue.

Based on our conclusion that *Kucana* controls the issue in question, we hold that we have jurisdiction to decide if an IJ's denial of a venue-transfer motion was an abuse of discretion.  With regard to Dugboe's other claims, we have jurisdiction under 8 U.S.C. § 1252 because that statute provides for judicial review of orders of removal.  *See* 8 U.S.C. § 1252(a)(1), (b).

## III. ANALYSIS

### A.     Motion to remand

Dugboe argues that the BIA abused its discretion by not remanding his case so that he could seek to adjust his status based on his marriage to a U.S. citizen.  We review the BIA's denial of a motion to remand under the abuse-of-discretion standard.  *Abu-Khaliel v. Gonzales*, 436 F.3d 627, 634 (6th Cir. 2006).  "The BIA abuses its discretion when it acts arbitrarily, irrationally, or contrary to law."  *Sanchez v. Holder*, 627 F.3d 226, 230 (6th Cir. 2010) (internal quotation marks and brackets omitted).

As discussed above, the BIA offered two independent reasons in its order on remand for concluding that Dugboe was not eligible to adjust his status: (1) that Dugboe is an arriving alien in removal proceedings and therefore ineligible to adjust his status, and (2) that Dugboe cannot adjust his status because his false claim of U.S. citizenship renders him inadmissible, which in turn makes him ineligible to adjust his status.  Because we are reviewing the BIA's most recent order, we can consider both reasons given.  But we will examine only the second reason because the BIA's first reason is more complex to analyze, and because the second reason independently supports the conclusion that Dugboe is ineligible to adjust his status.

To adjust his or her status, an alien must be "admissible to the United States for permanent residence."  8 U.S.C. § 1255(a).  Even 8 U.S.C. § 1255(i)—which provides an exception to some of the requirements for adjusting status in § 1255(a)—authorizes the Attorney General to adjust the alien's status only if, among other things, "the alien . . . is admissible to the United States for permanent residence."  *Id*. § 1255(i)(2)(A).  This admissibility requirement is therefore mandatory.

"Any alien who falsely represents, or has falsely represented, himself or herself to be a citizen of the United States for any purpose or benefit under this chapter . . . or any other Federal or State law is inadmissible."  8 U.S.C. § 1182(a)(6)(C)(ii)(I).  If an alien is found to be inadmissible for this reason, then the Attorney General cannot waive the inadmissibility.  *Pichardo v. INS*, 216 F.3d 1198, 1201 (9th Cir. 2000) (holding that

because the "waiver provisions contained in 8 U.S.C. §§ 1182(a)(6)(C)(iii) and 1182(i)[]
specifically limit the Attorney General's discretionary waiver to § 1182(a)(6)(C)(i),"
which mandates inadmissibility for aliens who engage in fraud or willfully misrepresent
a material fact for immigration purposes, the Attorney General may not waive
inadmissibility based on § 1182(a)(6)(C)(ii), which mandates inadmissibility for aliens
who falsely claim U.S. citizenship for immigration purposes).

The IJ found that Dugboe had falsely claimed to be a U.S. citizen when he
reentered the United States from Canada in 1997, and that he was removable for this
reason. Dugboe does not contest this finding on appeal with any reasoned argument
based on the record or legal authority. Instead, he simply labels the finding "alleged."
He has thus waived any challenge to his inadmissibility based on that finding because
"[i]t is well-established that issues adverted to in a perfunctory manner, unaccompanied
by some effort at developed argumentation, are deemed waived." *See Dillery v. City of
Sandusky*, 398 F.3d 562, 569 (6th Cir. 2005) (internal quotation marks omitted).
Dugboe's argument that he "may have been eligible for a waiver of inadmissibility
pursuant to I.N.A. § 212(i)," (8 U.S.C. § 1182(i)), is therefore without merit because
inadmissibility based on a false claim of U.S. citizenship is nonwaivable for the reasons
set forth above.

Because Dugboe is not admissible to the United States for permanent residence,
he has no basis to adjust his status. 8 U.S.C. § 1255(a). Dugboe's motion to remand his
case for that purpose was thus futile. We therefore conclude that the BIA's decision to
deny his motion was not an abuse of discretion.

**B.     Motion to transfer venue**

Dugboe also contends that the IJ abused his discretion by denying Dugboe's
motion to transfer the venue of the removal proceedings from Detroit to Chicago.
Appellate courts review the denial of a venue-transfer motion under the abuse-of-
discretion standard. *Monter v. Gonzales*, 430 F.3d 546, 558 (2d Cir. 2005). An IJ may
grant a venue-transfer motion "for good cause." 8 C.F.R. § 1003.20(b). "Good cause
is determined by balancing such factors as administrative convenience, the alien's

residence, the location of witnesses, evidence and counsel, expeditious treatment of the case, and the cost of transporting witnesses and evidence to a new location." *Monter*, 430 F.3d at 559 (internal quotation marks omitted).  And even if the IJ is found to have abused his or her discretion in denying the venue-transfer motion, the alien is still not entitled to a remand unless prejudice is shown.  *Id.*  To establish prejudice, the alien "must show that the denial of the venue change affected either the outcome or the overall fairness of the proceeding."  *Id.* (internal quotation marks and ellipses omitted).

The IJ in the present case did not abuse his discretion by denying Dugboe's venue-transfer motion.  Although Dugboe had already confessed to the immigration authorities that he had sought to reenter the United States at Port Huron, Michigan by falsely claiming to be a U.S. citizen, Dugboe would not admit to the factual allegations and charges against him at the hearing.  The government thus had to call Inspector Cozza, who was based in the Detroit area, to substantiate the charges.  Dugboe would have understandably preferred to have the proceedings take place in Chicago where he lived, but his intransigence created a situation where the government had an equally compelling basis to pursue his removal in Detroit.  His offer to allow the agents to testify telephonically did not tip the scales in Dugboe's favor because the government may generally prove its case in the way it thinks best, and having witnesses testify in person is arguably more persuasive than having them testify telephonically.

Moreover, even if the IJ were found to have abused his discretion, Dugboe has failed to establish prejudice.  Dugboe, his wife, and his attorney were all able to appear in Detroit for the proceedings.  And he has not shown—as he must—"that the denial of the venue change affected either the outcome or the overall fairness of the proceeding." *See id.*  Dugboe instead argues that having the proceedings in Detroit was hard on him and his family.  But this inconvenience had nothing to do with the outcome or fairness of the proceedings and thus does not suffice to show prejudice.

**C.      Withholding of removal under the INA and the CAT**

Finally, Dugboe claims that the IJ's decision to deny him withholding of removal under the INA and the CAT is not supported by substantial evidence.  The INA provides that "the government may not remove an alien to a country if he can prove that it is more likely than not that his 'life or freedom would be threatened in that country because of the alien's race, religion, nationality, membership in a particular social group, or political opinion.'"  *Haider v. Holder*, 595 F.3d 276, 283 (6th Cir. 2010) (quoting 8 U.S.C. § 1231(b)(3)(A)).

Courts employ the same basic framework for evaluating an alien's eligibility for asylum as they do for withholding of removal under the INA, "but in the case of withholding, a higher probability of persecution is required." *Castellano-Chacon v. INS*, 341 F.3d 533, 545 (6th Cir. 2003).  The alien must show a "clear probability" of persecution. *Liti v. Gonzales*, 411 F.3d 631, 640-41 (6th Cir. 2005).  To qualify for withholding of removal under the CAT, the alien must "establish that it is more likely than not that he or she would be tortured if removed to the proposed country of removal."  8 C.F.R. § 1208.16(c)(2).

Where the BIA adopts the IJ's decision, as it did here in denying Dugboe's withholding-of-removal claims under the INA and the CAT, this "court reviews the IJ's decision directly to determine whether the decision of the BIA should be upheld on appeal." *Amir v. Gonzales*, 467 F.3d 921, 924 (6th Cir. 2006) (internal quotation marks omitted).  The IJ's factual findings are reviewed under the substantial-evidence standard, and the decision to deny withholding of removal will not be reversed unless it is "manifestly contrary to law." *Id.* (internal quotation marks omitted).  For us to reverse, "we must find that the evidence not only supports a contrary conclusion, but indeed *compels* it." *Id.* (internal quotation marks omitted) (emphasis in original); *see also* 8 U.S.C. § 1252(b)(4)(B) (providing that "the administrative findings of fact are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary").

This standard applies to credibility determinations as well because they are considered factual findings. *Amir*, 467 F.3d at 925. But if the IJ finds that an alien is not credible, then the IJ's decision must include specific reasons for this conclusion. *Id.* The adverse-credibility finding must also "be based on issues that go to the heart of [Dugboe's] claim" because Dugboe filed his asylum application before the standard governing credibility determinations was changed by the REAL ID Act in 2005. *See id.* at 925, 925 n.4 (internal quotation marks omitted).

Dugboe's credibility problems indeed go to the heart of his claims for relief, and his various inconsistencies and refusals to answer provide substantial evidence supporting the IJ's decision. Because there are so many credibility problems with Dugboe's testimony and his asylum application, we will highlight only a few of them. The IJ correctly noted that Dugboe's testimony contradicted information in his asylum application. For example, Dugboe's application states that his brother, who was allegedly arrested for participating in a Christian demonstration, was imprisoned for one-and-a-half months under terrible conditions. But Dugboe testified repeatedly that he had no idea how long his brother was incarcerated, in part because Dugboe was "on the run" from unspecified danger and had no time to ask his brother. And Dugboe gave this contradictory testimony even though he had reviewed his asylum application with his lawyer for 28 minutes just before testifying.

Dugboe contends that this contradiction is minor because requiring him to know precisely how long his brother was imprisoned is an "unreasonable demand." But the point is not that Dugboe failed to recall a specific length of time; it is rather that his testimony flatly contradicts his application. This contradiction also distinguishes *Liti*, on which Dugboe relies, because no part of the asylum application in *Liti* contradicted the Liti family's later testimony. Moreover, the IJ reasoned that Dugboe's testimony about this incident itself was unbelievable:

> Now, before in his testimony, he made [it] sound like this demonstration
> was one of those things that actually led up to him fleeing Nigeria in fear
> of his life. But no, he said: I do not know when it was, all I can tell you

is it was sometime in the 1980's.  How long was he incarcerated for?
Oh, I just did not have time to ask.  Completely unbelievable.

Aside from the contradiction about when the incident with Dugboe's brother occurred, Dugboe testified that Harry was the brother in question, only to later claim that it was Dourbo, another brother.  These various contradictions, as well as the vagueness in Dugboe's asylum application and testimony, were factors that the IJ considered in deciding that Dugboe was not credible.

The IJ also took into account Dugboe's history of lying about his citizenship to immigration officials.  *See Sarvia-Quintanilla v. INS*, 767 F.2d 1387, 1393 (9th Cir. 1985) (reasoning that the IJ's decision to discredit the alien's testimony and give it "very little weight" was supported by the alien's history of dishonesty).  Dugboe used fraudulent documents in attempting to enter Canada and then in reentering United States, and he repeatedly claimed to be a U.S. citizen to immigration officials.  Moreover, once he was in removal proceedings, he refused to come clean about this incident even though he had already given a sworn statement admitting that he had falsely claimed to be a U.S. citizen.  As the IJ stated:  "He refused to answer any number of questions, and he denied an ability to remember other things that he quite clearly had the ability to remember, and he lied about other things."

The documentary evidence also supports the IJ's decision.  According to the State Department's 2002 Country Report, the Nigerian Constitution "provides for freedom of religion" and "prohibits state and local governments from adopting an official religion."  The Report notes that the religious tension in Nigeria has occasionally erupted into violence, but the IJ's conclusion that the Report did not establish a "pattern or practice of persecution" is reasonable given the infrequency of violence described therein.  Moreover, the State Department's 1997 Profile of Asylum Claims & Country Conditions for Nigeria states that many asylum claims based on religious persecution of Christians by Muslims "greatly exaggerate the extent of discrimination against Christians."

Dugboe's fear that his daughter would be forced to undergo FGM in Nigeria is similarly exaggerated. The Profile notes that the father controls the children, so that "[i]f the father opposes FGM, . . . the children would almost certainly be safe." Because Dugboe opposes FGM for his daughter, his fear that she will undergo FGM if she moves to Nigeria with him is meritless. The evidence in the record—coupled with the IJ's finding that Dugboe lacked credibility—provide more than substantial evidence supporting the IJ's finding that Dugboe failed to establish the likelihood that he or his daughter would be persecuted or tortured if they return to Nigeria.

## IV.  CONCLUSION

For all of the reasons set forth above, we **DENY** Dugboe's petition for review.